No. 23-2449

---

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

JASON L. SMITH,
Defendant-Appellant.

---

Appeal from the United States District Court
for the Northern District of Indiana
Case No. 3:10-CR-00107
The Honorable Judge Robert L. Miller

---

BRIEF AND REQUIRED SHORT APPENDIX OF
DEFENDANT-APPELLANT, JASON L. SMITH

---

FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF ILLINOIS
300 W. Main Street
Urbana, Illinois 61801
Telephone:   217-373-0666
Fax:             217-373-0667
Email: Michael_Roy@fd.org

THOMAS W. PATTON
Federal Public Defender

MICHAEL WILL ROY
Assistant Federal Public Defender

Attorneys for Defendant-Appellant,
JASON L. SMITH

---

**ORAL ARGUMENT REQUESTED**

---

# Circuit Rule 26.1 Disclosure Statement

Appellate Court No: 23-2449
Short Caption: United States v. Smith

☐  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case:

**Jason L. Smith**

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

**Federal Public Defender's Office for the Central District of Illinois; and**

_____

(3)  If the party or amicus is a corporation: N/A
    i)      Identify all its parent corporations, if any; and

**N/A**

    ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:

**N/A**

(4)  Provide the information required by FRAP 26.1(b) - Organizational Victims in Criminal Cases:

**N/A**

(5)  Provide Debtor information required by FRAP 26.1(c)1 & 2:

**N/A**

Attorney's Signature: **/s/ Michael Will Roy**      Date: **December 11, 2023**

Attorney's Printed Name: Michael Will Roy

Please indicate if you are *Counsel of Record* for the      ☒ **Yes**
above listed parties under Circuit Rule 3(d).      ☐ No

| Address: | Federal Public Defender | Phone Number: | (217) 373-0666 |
| | 300 West Main Street | Fax Number: | (217) 373-0667 |
| | Urbana, Illinois 61801 | Email: | Michael_Roy@fd.org |

# Table of Contents

**Page**

Circuit Rule 26.1 Disclosure Statement .............................................................. ii

Table of Authorities ..................................................................................... v

Introduction and Summary of Argument ............................................................ 1

Jurisdictional Statement ................................................................................ 3

Issues Presented for Review ........................................................................... 4

Statement of the Case ................................................................................... 5

    I.      Government's motion to present video testimony ................................. 5

    II.     Evidence of drug-related violations ................................................. 6

    III.    Alleged high-speed chase in Indiana and Michigan ............................. 8

    IV.    The party's arguments, and the court's findings ................................. 11

    V.     Sentencing .............................................................................. 12

Argument ................................................................................................. 14

    I.      Smith had a Sixth Amendment right to confront his accusers before
          revocation of supervised release. ................................................... 14

          A.    Standard of review ............................................................ 15

          B.    This Court needs to rethink its revocation precedent. ................ 15

               1.    Prior to *United States v. Haymond*, this Court assumed
                     that all revocations of community supervision were the
                     same. ................................................................. 15

               2.    The Supreme Court's decision in *United States v.
                     Haymond* upturns this Court's understanding that the
                       Sixth Amendment does not apply to supervised
                       release. ............................................................... 19

          C.    The Framers would have understood the Sixth Amendment
               to apply to revocation proceedings. ........................................ 23

               1.    Justice Alito was correct that recognizances closely
                       resemble federal supervised release ................................. 23

2.  Contrary to Justice Alito's dissent, the Framers understood defendants facing recognizance forfeiture to have Sixth Amendment rights. .................................. 29

3.  Justice Gorsuch correctly identified a "structural difference" between supervised release versus probation or parole.......................................................31

4.  The Sixth Amendment is a bundle of rights. .................. 35

D.  Smith's right to confrontation, embodied in the Sixth Amendment, was violated here. ................................. 36

II.  The district court also violated the Fifth Amendment and federal rules when it accepted hearsay evidence without balancing the parties' interests. ................................................................ 40

A.  Standard of review ................................................... 40

B.  Legal standard........................................................... 41

C.  Application.................................................................. 42

III.  The court erred by adjudicating Smith guilty for a violation that the government dismissed. ................................................................ 45

A.  Standard of review ................................................... 45

B.  Legal standard........................................................... 45

C.  Application.................................................................. 46

IV.  The written judgment must be amended to match the district judge's oral pronouncement. ................................................................ 49

A.  Standard of review ................................................... 49

B.  Legal standard........................................................... 49

C.  Application.................................................................. 49

Conclusion ............................................................................................. 52

Certificate of compliance with Fed. R. App. P. 32(a)(7)(B) ............................................... 53

# Table of Authorities

**Page**

## Cases

*Alleyne v. United States*, 570 US 99 (2013)................................................19, 21

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)..........................................19, 21, 36

*Bullcoming v. New Mexico*, 564 U.S. 641 (2011) .......................................... 37

*Commonwealth v. Davies*, 1 Binn. 97 (Pa. 1804) ...................................... 27, 30

*Commonwealth v. Emery*, 2 Binn. 431 (Pa. 1810) ........................................ 30

*Compania Administradora de Recuperacion v. Titan Int'l, Inc.*,
    533 F.3d 555 (7th Cir. 2008) ................................................................ 41

*Coy v. Iowa*, 487 U.S. 1012 (1988) .......................................................... 37

*Crawford v. Washington*, 541 U.S. 36 (2004) ............................................. 35

*Davis v. Washington*, 547 U.S. 813 (2006) ................................................ 36

*Estelle v. Gamble*, 429 U.S. 97 (1976) ..................................................... 50

*Ex Parte U.S.*, 242 U.S. 27 (1916) ..........................................................31

*Gagnon v. Scarpelli*, 411 U.S. 778 (1973) ........................................... passim

*In re U.S.*, 503 F.3d 638 (7th Cir. 2007) ............................................. 46, 47

*Johnson v. United States*, 529 U.S. 694 (2000) .......................................... 33

*Maryland v. Craig*, 497 U.S. 836 (1990) .................................................. 37

*Mistretta v. United States*, 488 U.S. 361 (1989) .......................................17, 32

*Mix v. People*, 29 Ill. 196 (1862) ........................................................... 29

*Morrissey v. Brewer*, 408 U.S. 471 (1972).......................................... passim

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ......................... 34

*Oregon v. Ice*, 555 U.S. 160 (2009) ........................................................ 36

v

*Regina v. Harmer*, 1859 WL 9677 (U.C. Q.B. 1859) ............................................ 29

*Respublica v. Cobbett*, 3 U.S. 467 (Penn. 1798) ............................................ 25, 28

*Rex v. Wiblin*, 2 Car. & P. 9 (1825) ............................................ 30

*Sans v. People*, 3 Gilman 327 (Ill. 1846) ............................................ 29

*Tapia v. United States*, 564 U.S. 319 (2011) ............................................ 15, 17, 32, 33

*United States ex rel. Welch v. Lane*, 738 F.2d 863 (7th Cir. 1984) ............................................ 46

*United States v. Baldwin*, 68 F.4th 1070 (7th Cir. 2023) ............................................ 45

*United States v. Barnes*, 907 F.2d 693 (7th Cir. 1990) ............................................ 46

*United States v. Boultinghouse*, 784 F.3d 1163 (7th Cir. 2015) ............................................ 1, 17, 41

*United States v. Bowers*, No. 23-902 (9th Cir.) ............................................ 15

*United States v. Cejas*, 761 F.3d 717 (7th Cir. 2014) ............................................ 46, 47

*United States v. Falls*, 960 F.3d 442 (7th Cir. 2020) ............................................ 41

*United States v. Harris*, 51 F.4th 705 (7th Cir. 2022) ............................................ 49

*United States v. Haymond*, 139 S. Ct. 2369 (2019) ............................................ passim

*United States v. Johnson*, 765 F.3d 702 (7th Cir. 2014) ............................................ 49

*United States v. Jordan*, 742 F.3d 276 (7th Cir. 2014) ............................................ passim

*United States v. Jordan*, 765 F.3d 785 (7th Cir. 2014) ............................................ 6, 18, 37, 43

*United States v. Kelley*, 446 F.3d 688 (7th Cir. 2006) ............................................ 17, 18

*United States v. Kersee*, --F.4th--, No. 23-20381,
2023 WL 7982576 (5th Cir. Nov. 17, 2023) ............................................ 42, 44

*United States v. Lee*, 77 F.4th 565 (7th Cir. 2023) ............................................ 41

*United States v. Lloyd*, 566 F.3d 341 (3d Cir. 2009) ............................................ 41

*United States v. Medina-Mora*, 796 F.3d 698 (7th Cir. 2015) ............................................ 49

*United States v. Miller*, 900 F.3d 509 (7th Cir. 2018) ............................................ 45, 46, 48

*United States v. Moslavac*, 779 F.3d 661 (7th Cir. 2015) ................................. 42

*United States v. Oliver*, 873 F.3d 601 (7th Cir. 2017) ........................ 46, 48

*United States v. Paul*, 542 F.3d 596 (7th Cir. 2008) .............................. 39

*United States v. Peguero*, 34 F.4th 143 (2d Cir. 2022) ........................ 18

*United States v. Pratt*, 52 F.3d 671 (7th Cir. 1995) ............................... 21

*United States v. Sineneng-Smith,* 140 S. Ct. 1575 (2020) .................... 46

*United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015) ................... 33

*United States v. Tucker*, 404 U.S. 443 (1972) ...................................... 46

*United States v. Van Sach*, 458 F.3d 694 (7th Cir. 2006) ....................15

*United States v. Webster*, 775 F.3d 897 (7th Cir. 2015) ....................... 37

*United States v. Williams*, 559 F.3d 607 (7th Cir. 2009). ..................... 36

## Statutes

18 U.S.C. § 922(g)(1) .................................................................................... 3

18 U.S.C. § 924(c) ........................................................................................... 3

18 U.S.C. § 3231 .............................................................................................. 3

18 U.S.C. § 3553(a) ....................................................................................... 32

18 U.S.C. § 3582(a) .....................................................................................32, 33

18 U.S.C. § 3583 .............................................................................................. 3

18 U.S.C. § 3583(c) .....................................................................................32, 33

18 U.S.C. § 3583(h) .....................................................................................12, 39

18 U.S.C. § 3583(k) .....................................................................................19, 21

18 U.S.C. § 3742 .............................................................................................. 3

21 U.S.C. § 841 ............................................................................................12, 39

21 U.S.C. § 841(a) ................................................................ 3

28 U.S.C. § 1291 ................................................................. 3

**Other Authorities**

1 Edward Coke, *The Fourth Part of the Institutes of the Laws of England Concerning the Jurisdiction of the Courts* (1797) ................................................. 26

1 J. Bishop, Criminal Procedure (2d. ed. 1872) ................................................. 20

1 Papers of John Adams (R. Taylor ed. 1977) ................................................. 40

2 Diary & Autobiography of John Adams 3 (L. Butterfield ed. 1961) ................................................. 40

4 W. Blackstone, *Commentaries on the Laws of England* 298 (1769) ........................... passim

Aurora Gen. Advertiser (Feb. 7, 1805) (No. 4401) ................................................. 25

Bradly Chapin, *Criminal Justice in Colonial America* (1606–1660) (1983) ......................... 26

Fed. R. App. P. 4(b)(1)(A)(i) ................................................................. 3

Fed. R. Crim. P. 32.1(b) ........................................................... passim

Fiona Doherty, *Indeterminate Sentencing Returns: The Invention of Supervised Release*, 88 N.Y.U. L. Rev. 958 (2013) .................................. 16, 33

Jacob Schuman, *Revocation at the Founding*, 122 Mich. L. Rev. __, at 34 (forthcoming 2024) ........................................................... passim

Lawrence M. Friedman, *Crime & Punishment in Am. History* (1993) ................................ 23

Nathaniel J. Berry, *Justice of the Peace Manuals in Virginia Before 1800*, 26 J.S. Legal Hist. 315 (2018) .................................. 23

Norfolk Gazette & Publick Ledger No. 136 (May 29, 1807) ................................. 26

The Centinel No. 43 (Mar. 25, 1807) ................................................. 26

The Year Books: Report #1494.073, *Legal History: The Year Books, Boston University School of Law*) ................................. 30

Thomas Raeburn White, *Commentaries on the Constitution of Pennsylvania* (1907) ...................................................... 28

U.S. Const. amend. V ..................................................... passim

U.S. Const. amend. VI .................................................... passim

U.S. Sent. Comm'n, Guidelines Manual, ch. 7, pt. A(2)(b) (Nov. 2012) ........................ 33

U.S.S.G. § 7B1.1(a)(2) ...................................................... 44

U.S.S.G. § 7B1.3(a)(1) ...................................................... 44

William Hening, *New Virginia Justice* at 25 (1795) ............................... 24, 25, 26

## Introduction and Summary of Argument

Jason Smith invoked his Sixth Amendment rights during a hearing for revocation of his supervised release. At first blush, that argument may sound wrong. The Supreme Court has said that the Sixth Amendment does not apply to revocations of probation, *see Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973), or revocations of parole, *see Morrissey v. Brewer*, 408 U.S. 471, 480 (1972). And this Court has long assumed that the same rule applies to proceedings for revocation of supervised release. *See, e.g., United States v. Boultinghouse*, 784 F.3d 1163, 1171 (7th Cir. 2015) (The Fifth Amendment, not the Sixth Amendment, applies to revocations of supervised release).

This assumption, however, is due for reconsideration after the Supreme Court's decision in *United States v. Haymond*, 139 S. Ct. 2369 (2019). As Justice Gorsuch explained in *Haymond*: Unlike with probation or parole, a revocation of federal supervised release allows a judge to impose additional prison time beyond that authorized by a jury's verdict. *Id.* at 2382. This "structural difference bears constitutional consequences." *Id.* The Framers of the Constitution would have understood the Sixth Amendment to apply to supervision revocations. Indeed, historical evidence shows that jury trials were the norm for very similar proceedings at the time of the founding.

Had the district court applied the Sixth Amendment's Confrontation Clause, as Smith requested and the Framers intended, the court would have needed to reject the government's key evidence against Smith. Smith would not be in prison right now.

Instead, the court relied on circuit law applying the Fifth Amendment and the Federal Rules of Criminal Procedure, admitted the evidence, and revoked Smith's supervision.

This Court should revisit its revocation precedent, hold that the Sixth Amendment applies to revocations of supervised release, and vacate the revocation judgment in this case. Alternatively, this Court should vacate the judgment because the government's evidence was inadmissible even under the less-strenuous requirements of the Fifth Amendment and Federal Rule of Criminal Procedure 32.1(b)(2)(C). Finally, the district court erred by adjudicating Smith guilty for a violation that the government dismissed, and by issuing a written judgment that did not match the oral sentence. If nothing else, these final two errors require remand.

# Jurisdictional Statement[1]

The jurisdiction of the United States District Court for the Northern District of Indiana was founded upon 18 U.S.C. §§ 3231 and 3583. A grand jury sitting in the aforementioned district charged Jason L. Smith by indictment with (1) possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1); (2) possession with intent to distribute ecstasy, in violation of 21 U.S.C. § 841(a)(1); (3) possession of a firearm as a felon, in violation 18 U.S.C. § 922(g)(1); and (4) possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c). (R. 1.) A jury found Smith guilty of Counts 1, 3, and 4, and following a term of imprisonment, Smith commenced supervised release on June 16, 2022. (R. 57, 169.) The district court revoked Smith's supervised release on July 17, 2023. (R. 196.)

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The district court imposed sentence upon revocation on July 17, 2023, and entered a revocation judgment on the same day. (R. 194, 196.) Smith filed a timely notice of appeal on July 25, 2023. (R. 199.) FED. R. APP. P. 4(b)(1)(A)(i).

---

[1] The following abbreviations are used herein: record on appeal: "R.___ at ___;" and appendix: "App. at ___."

## Issues Presented for Review

I.       Does the Sixth Amendment apply during proceedings for revocation of supervised release?

II.       Alternatively, did the district court err by admitting hearsay evidence without conducting the balancing test required by Federal Rule of Criminal Procedure 32.1(b)(2)(C)?

III.       Alternatively, did the district court err by adjudicating Smith guilty for an alleged violation of supervision that the government dismissed?

IV.       If the judgment is otherwise affirmed, should the written judgment still be amended to match the district judge's oral pronouncement of the sentence?

**Statement of the Case**

In 2011, a jury found Jason Smith guilty of possession with intent to distribute cocaine base, illegally possessing a firearm as a felon, and possessing a gun in furtherance of drug trafficking. (R. 57.) After serving a prison sentence of 147 months (R. 114), Smith started a three-year term of supervised release in June 2022 (R. 137; R. 188 at 1).

About a year into his supervision, the government obtained a warrant for Smith's arrest and brought him into custody. (R. 188 at 2.) A probation officer alleged that Smith had tested positive for marijuana multiple times, failed to report for a drug test, failed to attend mandatory drug treatment, and failed to report contact with state police. (R. 188 at 2–3.) The officer further alleged that Smith had committed three new crimes while on supervision: (1) an Ohio felony offense for failure to comply with police orders; (2) an Indiana felony offense resisting law enforcement; and (3) a Michigan felony offense for fleeing. (R. 188 at 2.)

## I.    Government's motion to present video testimony

Prior to the revocation hearing, the government moved to allow Smith's former probation officer, Abram Jones, to testify by video. (R. 192.) The sole basis for the request was that Jones had moved out of state. (R. 192 at 3.)

Although the government acknowledged that Smith opposed to the motion (R. 192 at 3), the district court summarily granted it without giving the defense a chance to respond. (R. 193.) The court explained that video testimony would be permissible under

Seventh Circuit precedent applying Federal Rule of Criminal Procedure 32.1(b)(2)(C). *See United States v. Jordan ("Jordan II")*, 765 F.3d 785, 787 (7th Cir. 2014).

At the revocation hearing, however, Smith clarified that his objection was based on the Sixth Amendment—not just the federal rules. (App. at 9–10.) Smith argued that the Confrontation Clause granted him the right to confront his accusers face-to-face. (App. at 10.) And he maintained that the revocation proceeding was a criminal prosecution, for which his Sixth Amendment rights would apply. (App. at 10.)

The court acknowledged that application of the Sixth Amendment to revocation proceedings was an issue "yet to play out completely in the courts." (App. at 10.) But it nonetheless stood by its original ruling without further analysis. (App. at 10.)

## II. Evidence of drug-related violations

The report of violations alleged that Smith committed five violations related to drug testing. (R. 188 at 2.) Smith admitted to two of these violations, based on positive drug tests for marijuana on July 25 and December 5, 2022 (*i.e*, "Mandatory Condition No. 2, Violation Nos. 2 and 4"), but he denied the remainder of the allegations. (App. at 6–8.) The government, in turn, admitted that it could not prove one of the alleged violations, based on a positive drug test on June 22, 2022 ("Mandatory Condition No. 2, Violation No. 1"). (App. at 68.) The parties' concessions left two drug-test violations in dispute: A positive marijuana test on November 4, 2022, and an alleged failure to report for drug testing on February 23, 2023. (R. 188 at 2–3.)

Separately, the probation officer's report also alleged that Smith had failed to report to mandatory drug treatment at a third-party treatment center. (R. 188 at 3.)

The government called Smith's former probation officer Jones to testify about these violations. (App. at 10.) Jones testified remotely by video. (App. at 8.) The transcript suggests that, during at least some portions of Jones's testimony, Smith's attorney had trouble hearing Jones. (App. at 40.)

During Jones's testimony, the government submitted three reports allegedly showing that Smith's urine had tested positive for marijuana. (App. at 18, 25–26, 28.) These reports were not created by Jones; rather, they came from a lab to which Jones said he had sent Smith's urine samples. (App. at 18.) Smith objected to each of the lab reports, arguing that the government had failed to lay foundation, establish a chain of custody, or establish that the lab used reliable principles to develop the reports. (App. at 19–20, 26, 28.) Smith further objected that the reports violated the Confrontation Clause unless the expert who prepared each report personally appeared to testify. (App. at 21, 26, 28.)

In response to Smith's objections, the court asked the government to clarify if it intended to submit the reports only for a limited, nontestimonial purpose. (App. at 19–20.) But the government confirmed that, no, it was submitting the reports for the truth of the matter asserted within them. (App. at 20.) Nonetheless, the government insisted that the reports were sufficiently reliable for admission at a revocation hearing. (App. at 20.) The court overruled Smith's objections and admitted all three reports, on the basis that

the court could "infer" that the tests were reliable because the court could "infer" that the probation office probably had a contract with the testing lab. (App. at 21–22, 27–28.)

Next, the government tried to submit hearsay evidence from two third-party treatment clinics; specifically, the government wanted to introduce Jones's recollection of a phone call from one clinic and a written report he received from another. (App. at 31, 35–36.) This evidence would have shown that Smith failed to attend the clinic on certain dates. (App. at 31, 35.) But because Jones had no first-hand knowledge of Smith's performance at the clinics, Smith objected to this evidence as unauthenticated, hearsay, and a violation of the Confrontation Clause. (App. at 32, 35.)

The court disagreed with Smith that the Confrontation Clause applied. (App. at 34.) But even without the Confrontation Clause, the court concluded that Rule 32.1(b)(2)(C) required the government to explain why it could not call in any witnesses from the clinics to testify. (App. at 34–35.) When the government could not provide an explanation, the court sustained the objection. (App. at 35–36.) Unable to provide admissible evidence of Smith's absences at the clinic, the government agreed to drop those violations. (App. at 36.)

Finally, Jones testified that Smith did not show up for a scheduled drug test. (App. at 36–37.)

## III. Alleged high-speed chase in Indiana and Michigan

For the new substantive crimes that Smith allegedly committed in Ohio, Indiana, and Michigan, the government decided to pursue only the Indiana offense, while

dropping the other two. (R. 188 at 2; App. at 8–9.) The government also decided not to pursue the allegation that Smith failed to report contact with police to his probation officer. (R. 188 at 3; App. at 68.)

The one violation the government pressed forth on was the allegation that Smith committed the Indiana felony offense of resisting law enforcement on May 18, 2023 ("Mandatory Condition No. 1, Violation No. 1"). (R. 188 at 2.) The government relied on two witnesses.

First, the government called Ryan Rush, a police officer from South Bend, Indiana. (App. at 42.) Rush testified that the United States Marshals asked him to help surveil Smith. (App. at 42.) According to Rush, the marshals gave Rush a photo of Smith, told Rush that Smith had an outstanding warrant, and told Rush that Smith was going to drive to a local liquor store in a white Chevy Malibu. (App. at 43–44.) Rush staked out the location with his partner, both of whom were in an unmarked car. (App. at 43–44, 49.)

Rush testified that he saw a Malibu enter the liquor store's parking lot, and then speed away when marked squad cars approached. (App. at 44, 47–48.) According to Rush, he was able to identify the Malibu's driver as Smith using the photograph he received from the Marshals. (App. at 44–45.) The photo showed a black man with a hat and a beard, and the driver was also a black man with a hat and a beard. (App. at 45.) In court, Rush identified Smith as the same person. (App. at 46.) Over Smith's objection, Rush said that his partner also identified Smith. (App. at 44.)

On cross, Smith tried to poke some holes in Rush's testimony. Smith pointed out that the photo Rush relied on included a hat, and so was not the clearest means of identification. (App. at 52–53.) Rush also admitted that he could not remember whether his partner's unmarked patrol car, which Rush had been sitting in, had tinted windows. (App. at 50.) And Rush conceded that his partner was the one sitting closer to the target Malibu. (App. at 52.) Yet, according to the police report from Rush's partner, Rush's partner described the passenger of the Malibu as having a different appearance than Rush described. (App. at 45, 50–51.)

The second witness was another South Bend police officer, Alexander Williams, who followed the Malibu in a high-speed chase. (App. at 54.) Williams described chasing the car to the Michigan border, after which he let Michigan police take over. (App. at 56–60.) Michigan police later found the parked car, with the passenger still inside but no sign of the driver. (App. at 61–62.) Williams conceded that he never saw or identified the Malibu's driver; he merely relied on other officers' assertion that the driver was Smith. (App. at 63–64.)

Smith himself testified last. (App. at 65.) He explained that prior to his arrest, he learned from his girlfriend that marshals had come to his girlfriend's work to look for him. (App. at 66.) After learning this information, Smith called the probation office to ask if he needed to turn himself in. (App. at 66.) The probation officer whom he spoke with told him no, he needed only to confirm his contact information. (App. at 66–67.)

Smith further testified that he had colon cancer. (App. at 67.)

The government did not dispute any of Smith's testimony. (App. at 68.)

## IV.  The party's arguments, and the court's findings

The government argued that it had proved four drug violations, plus Smith's violation of the Indiana offense of resisting law enforcement. (App. at 68–69.) Smith, on the other hand, continued to dispute the unadmitted drug violations. (App. at 69.) And on the more serious charge of committing a new felony, Smith challenged Rush's ability to identify him as the driver of the runaway Malibu. (App. at 69.) In particular, Smith pointed out that Rush's partner gave an inconsistent description of the car's occupants. (App. at 69–70.)

The court nonetheless found Smith guilty of all disputed violations. Relying on Probation Officer Jones's testimony and the objected-to lab reports, the court found Smith guilty of four drug violations. (App. at 70.) For the new felony in Indiana, the court found that Rush's identification of Smith proved Smith's involvement in the high-speed chase. (App. at 71.) "I suppose there's a remote chance that Officer Rush was mistaken, but it's not a very significant possibility." (App. at 71.) Rush's partner concurred in the identification, the court continued, which bolstered the evidence. (App. at 71.)

In sum, the court found Rush guilty of five violations:

- Committing a new felony in Indiana (Mandatory Condition 1, Violation 2);
- Testing positive for marijuana on:
  - July 25, 2022 (Mandatory Condition 2, Violation 2);
  - November 4, 2022 (Mandatory Condition 2, Violation 3);
  - December 5, 2022 (Mandatory Condition 2, Violation 4);

- Failing to appear for a drug test on February 23, 2023 (Mandatory Condition 2, Violation 5).

(App at 72, 82; R. 188.)

## V.    Sentencing

The defense asked for a sentence that would allow Smith to receive medical and mental-health treatment instead of imprisonment. (App. at 74.) Smith recently passed several dark blood clots in his stool, counsel explained, and had tested positive for colon cancer. (App. at 74.) Counsel further argued that Smith never had the opportunity to stay at a halfway house before entering supervision. (App. at 73.) Counsel, and Smith himself in allocution, also argued that Smith had tried to turn himself in months earlier to resolve any disputes about his supervision, but the probation office told him not to come in. (App. at 74–75.)

The court imposed 21 months' imprisonment. (App. at 81.) It chose the sentence primarily because, "while serving a federal criminal sentence, Mr. Smith led police from two states on a very high-risk 27-minute police chase." (App. at 80.)

The court also imposed a new term of supervised release. (App. at 81.) The court could have increased the length of Smith's supervision any amount it wanted: The drug-trafficking statute allows a lifetime term of supervised release, 21 U.S.C. § 841, so any violation of supervised release re-exposes Smith to a lifetime term. *See* 18 U.S.C. § 3583(h). The court imposed one year, concluding that a year would be sufficient for Smith to obtain needed programming. (App. at 81.)

Defense counsel asked the court to recommend placement at a facility that could provide receive appropriate treatment for Smith's colon cancer. (App. at 86.) The court agreed that this recommendation would be appropriate, and it said it would recommend "that the Bureau of Prisons designate as the place of the defendant's confinement a facility that can address the defendant's potential colon cancer. (App. at 86.)

The written judgment differed from the oral ruling in two ways. First, the written judgment said that Smith committed *two* new crimes while on supervision: The judgment listed Smith as guilty of committing *both* the Indiana offense of resisting law enforcement *and* the Michigan felony offense of fleeing law enforcement, even though the government dismissed the Michigan violation. (App. at 88.) Second, instead of recommending treatment for colon cancer, the written judgment recommended only that Smith should receive "mental health treatment and medical treatment for his medical conditions." (App. at 90.)

Smith timely appealed. (R. 199.)

**Argument**

**I.** **Smith had a Sixth Amendment right to confront his accusers before revocation of supervised release.**

Does the Sixth Amendment apply to supervised-release hearings? The Supreme Court recently addressed this question in *United States v. Haymond*, 139 S. Ct. 2369 (2019). The Court was split. Four justices seemingly said yes. One concurred. Four dissented. All looked to the Framers' understanding of the Sixth Amendment, delving into John Adams's diary, William Blackstone's Commentaries, and colonial-era treatises. When *Haymond* was decided, however, the justices lacked legal scholarship about how the Sixth Amendment applied on the ground at the time of the founding. Writing for the dissent, Justice Alito chided his colleagues for failing to cite any evidence that colonial courts provided juries for forfeitures of recognizance, a founding-era form of supervision similar to supervised release. *Id.* at 2396 (Alito, J., dissenting).

Jacob Schuman, a professor at Penn State Law, took up the question implied by Justice Alito's opinion. Realizing that no one had previously researched the issue, Professor Schuman looked into whether founding-era courts recognized a jury right for recognizance forfeitures. He found a clear answer: "yes, at the time the Constitution was ratified, recognizance forfeitures required a jury trial."[2] His research shows that, unequivocally, the Framers of the Sixth Amendment understood the jury-trial right to

---

[2] Jacob Schuman, *Revocation at the Founding*, 122 Mich. L. Rev. __, at 34 (forthcoming 2024) (available at: https://bit.ly/44JO5e0).

14

apply in circumstances indistinguishable in any meaningful way from modern supervised release.

Smith asks this Court to hold that the Sixth Amendment, including the Confrontation Clause, applies to revocations of supervised release. He recognizes that this is a novel argument for this Court, which has not applied the Sixth Amendment to revocation proceedings in the past. But the issue is teed up by *Haymond*, and by Professor Schuman's new research. A similar argument is currently pending in the Ninth Circuit in *United States v. Bowers*, No. 23-902. And Smith's case is a strong vehicle for reevaluation of the scope of the Sixth Amendment in this circuit. The time is now.

## A. Standard of review

Interpretation of the Confrontation Clause of the Sixth Amendment is a legal question reviewed *de novo*. *United States v. Van Sach*, 458 F.3d 694, 701 (7th Cir. 2006).

## B. This Court needs to rethink its revocation precedent.

### 1. Prior to *United States v. Haymond*, this Court assumed that all revocations of community supervision were the same.

To understand circuit law relating to revocations of supervised release, one must first start with probation and parole. For most of the 20th century, the federal government used a system of parole. *Tapia v. United States*, 564 U.S. 319, 323-25 (2011). Judges sentenced convicted defendants to terms of imprisonment, and after they had served one third of their sentences, they could apply to a parole board for conditional release. *See id*. But the balance of any remaining prison sentence remained hanging over parolees. When defendants violated a condition of parole, the board could "revoke" their

15

release and send them back to prison to serve the rest of their original sentences. Fiona Doherty, *Indeterminate Sentencing Returns: The Invention of Supervised Release*, 88 N.Y.U. L. Rev. 958, 985 (2013).

The Supreme Court addressed the application of the Sixth Amendment to parole in *Morrissey v. Brewer*, 408 U.S. 471, 472 (1972). By its text, the Sixth Amendment applies only to "criminal prosecutions." U.S. Const. amend. VI. And the Court held that because "revocation of parole is not part of a criminal prosecution," the "full panoply of rights" available under the Sixth Amendment did not apply. *Id.* at 480. A revocation proceeding, the Court explained, "arises after the end of the criminal prosecution, including imposition of the sentence." *Id.* at 480. In other words, parole did not affect the underlying prison judgment that was the result of the criminal prosecution. The "essence of parole" was early release on condition that prisoners abide by certain rules "during the balance of the sentence." *Id.* at 477. The balance remained if parole was revoked.

A year later, the Supreme Court tackled the same question regarding probation. It looked to *Morrissey*: "we held that the revocation of parole is not a part of a criminal prosecution"—again referencing the Sixth Amendment's textual limitation. *Gagnon v. Scarpelli*, 411 U.S. 778, 781 (1973) (citing *Morrissey*, 408 U.S. at 480). Again, the framing of revocation as outside the Sixth Amendment made sense because revocation of probation did not result in a new criminal sentence. Rather, probation was a result of the trial court's power to "suspend" the sentence that had resulted from the prosecution,

with the understanding that the defendant would need to serve the suspended sentence if probation was revoked. *See id.* at 779; *Mistretta v. United States*, 488 U.S. 361, 364 (1989).

More than a decade after *Morrissey* and *Gagnon*, Congress invented federal supervised release as part of the Sentencing Reform Act of 1984. 98 Stat. 1987; *Tapia*, 564 U.S. at 325. One can hardly overstate the act's impact. For decades, sentencing judges had relied on a concept of indeterminate sentencing, in which they were given "almost unfettered discretion" to choose prison sentences within wide outer boundaries. *Mistretta v. United States*, 488 U.S. 361, 363–64 (1989). Judges imposed those sentences, however, with an understanding that prison would be rehabilitative, and with an expectation that prisoners would be able to seek relief from a portion of their sentence through parole. *Tapia*, 564 U.S. at 324. With the invention of supervised release, Congress jettisoned the rehabilitative-imprisonment model, abolished parole for new convictions, and shifted federal law to a system of determinate sentencing. Federal prisoners are now expected to serve the entirety of their prison terms (minus small adjustments for federal "good time" and other nuances not relevant here).

Despite the seismic impact of the Sentencing Reform Act, decades passed without the Supreme Court addressing whether the holdings of *Gagnon* and *Morrissey* also applied to federal supervised release. Nonetheless, this Court has repeatedly assumed that they do. *See e.g., United States v. Boultinghouse*, 784 F.3d 1163, 1171 (7th Cir. 2015); *United States v. Kelley*, 446 F.3d 688, 690 (7th Cir. 2006) (collecting cases). Because the Supreme Court has held that other types of "revocations" do not fall within the Sixth

Amendment, this Court has concluded in the past that supervised release probably does not fall within the amendment either. *Kelley*, 446 F.3d at 690. Eventually, the idea that the Sixth Amendment does not apply to supervision revocations became settled gospel. This Court has not seriously considered the issue for decades.

This Court has recognized, however, practical problems with framing supervision revocation as outside the Sixth Amendment. "The defendant is not entitled to all of the protections of a criminal trial, but the stakes may be months or even years in prison." *United States v. Jordan ("Jordan II")*, 765 F.3d 785, 788 (7th Cir. 2014). Thus, even when not required by the Sixth Amendment, this Court has encouraged district courts to make "substantial efforts" to provide revocation defendants the opportunity to confront their accusers. *Id.* at 787–88.

This Court was right to be concerned about the stakes at revocation. Merely because of a person's supervision status, that person may be accused of a new crime and imprisoned for years without the constitutional protections of an indictment, a jury, cross-examination of witnesses, or evidence beyond reasonable doubt for each element of the offense. *See United States v. Peguero*, 34 F.4th 143, 168 (2d Cir. 2022) (Underhill, D.J., dissenting). These concerns could be alleviated if defendants simply received full Sixth Amendment protection at revocation. But until now, this Court has been hamstrung by a belief that the Sixth Amendment was unavailable in this context. *Haymond* changes that.

2. **The Supreme Court's decision in *United States v. Haymond* upturns this Court's understanding that the Sixth Amendment does not apply to supervised release.**

After 35 years of federal supervised release, the Supreme Court finally addressed revocation of supervised release in *United States v. Haymond*, 139 S. Ct. 2369. In a fractured 4-1-4 decision, the Supreme Court struck down a five-year mandatory minimum for revocation of certain sex offenders. *See* 18 U.S.C. § 3583(k). But the headline was Justice Gorsuch's logic for the plurality: "A judge's authority to issue a sentence derives from, and is limited by, the jury's factual findings of criminal conduct." *Haymond*, 139 S. Ct. at 2366. That broad statement would seemingly apply to all supervised-release sentences—including the revocation judgment appealed in this case.

The plurality concluded that § 3583(k) violated the jury right under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 570 US 99 (2013), because it triggered a five-year mandatory-minimum sentence based on facts found by a judge, not a jury. *See id*. at 2375-76. Although revocation of parole and probation did not require a jury, Justice Gorsuch identified a "structural difference" between those forms of supervision and supervised release. *Id*. at 2382. Parole and probation both "replace[d] a portion" of a prison term, and therefore revoking them exposed the defendant "only to the *remaining* prison term authorized for his crime of conviction, as found by a unanimous jury." *Id*. Supervised release, by contrast, runs "after the completion" of a prison sentence, and thus revocation can expose a defendant "to an additional mandatory minimum prison term well *beyond* that authorized by the jury's verdict." *Id*.

Justice Gorsuch also delved deeply into Founding-era documents for first principles. He explained that the revocation proceeding was a "criminal prosecution" within the meaning of the Sixth Amendment because, at the time of the founding, a "prosecution" of a defendant "simply referred to 'the manner of [his] formal accusation.'" *Id.* at 2376 (quoting 4 W. Blackstone, *Commentaries on the Laws of England* 298 (1769). Similarly, the Framers understood that "the concept of a 'crime' was a broad one linked to punishment"—that is, a crime refers to any acts done by a defendant "to which the law affixes punishment." *Id.* at 2376 (quoting 1 J. Bishop, Criminal Procedure §§ 80, 84, pp. 51–53 (2d. ed. 1872)) (cleaned up and additional citation omitted).

The plurality's analysis sat poorly with Justice Alito. Writing for a four-justice dissent, he believed the plurality's opinion was a thinly-veiled attack on supervised release as a whole. "[The plurality's implication] is clear enough: All supervised release proceedings must be conducted in compliance with the Sixth Amendment—which means that the defendant is entitled to a jury trial." *Haymond*, 139 S. Ct. at 2388 (Alito, J., dissenting). There is no other option: the supervised-release revocation statute "sets out the procedure" for "all supervised-release revocation proceedings," so if it's unconstitutional regarding the mandatory minimum at issue in *Haymond*, then "the whole idea of supervised release must fall." *Id.*

Justice Alito further criticized the plurality for "mak[ing] no real effort to show that the Sixth Amendment was originally understood to require a jury trial in a proceeding like a supervised-release revocation proceeding." *Id.* at 2392. He identified how, prior to

the adoption of the Sixth Amendment, "convicted criminals were often released on bonds and recognizances," and they could be imprisoned if they violated the conditions attached. *Id.* at 2396. Justice Alito claimed to see "no evidence that there was a right to a jury trial at such [recognizance] proceedings," and thus nothing supporting trial rights at supervised-release proceedings. *Id.* But the discussion was cursory; Justice Alito did not dive deeply into the history of recognizance-forfeiture proceedings and whether they included juries.

Justice Breyer was the tiebreaker. He declined to apply *Apprendi* and *Alleyne*. *See* id. at 2385-86 (Breyer, J., Concurring). Instead, he concluded that § 3583(k) was unconstitutional because of "three aspects" of the provision: (1) it applied to a discrete set of federal criminal offenses, (2) it took away the judge's discretion, and (3) it imposed a five-year minimum prison sentence. *Id.* at 2386. These aspects led him to "think it is less like ordinary revocation and more like punishment for a new offense, to which the jury right would typically attach." *Id.*

Although *Haymond* fractured the Court, the overlap between the various opinions is enough to upturn Seventh Circuit law. First, contrary to this circuit's precedent, the plurality expressly held that neither parole nor probation were analogous to supervised release. Off the bat, that's four justices who would abrogate cases like *United States v. Pratt*, 52 F.3d 671, 675 (7th Cir. 1995), which relied on *Gagnon* and *Morrissey* to conclude that the Sixth Amendment does not apply to supervision revocations. Justice Breyer did not join the plurality. But as Justice Gorsuch pointed out, Justice Breyer's concurrence

still agreed with the basic premise that revocations of supervised release, at least sometimes, can allow a court to impermissibly increase a statutory sentencing range without a jury. *Haymond*, 139 S. Ct. at 2384 n.9. That brings the count to five justices who meant to abrogate at least some of this circuit's revocation precedent.

More importantly, both the majority and the dissent agreed that courts must look at the Framers' original understanding of the Sixth Amendment at the time of the founding. *See id.* at 2375–77, 2392–93. Although he disagreed with the plurality's conclusion, Justice Alito explained that courts should look at specific historical analogues like recognizances to determine the scope of the Sixth Amendment. *Id* at 2396. This Court's prior cases did not conduct that type of analysis. And as explained below, applying the historical test described by the Justice Alito leads to only one conclusion: the Sixth Amendment applies to supervision revocations.

That brings the final count to *eight* justices who disagree with the methods this circuit previously used to analyze supervision revocations. Four because they disagree that supervised release is similar to parole or revocation, and four because they maintain that courts should apply a historical-analogue test to determine the Sixth Amendment's scope. Throw in Justice Breyer's one-judge concurrence, and there is now a full Court that would reevaluate supervision revocations in at least some instances. This Court should do that reevaluation.

### C. The Framers would have understood the Sixth Amendment to apply to revocation proceedings.

#### 1. Justice Alito was correct that recognizances closely resemble federal supervised release.

In his *Haymond* dissent, Justice Alito was right in looking to recognizances—recognizances and supervised release are close siblings. Founding-era courts used recognizances, also called a "peace bond" or "surety for the peace," to impose conditions on criminal defendants. *See* Schuman, *supra* note 2, at 4 (citing Lawrence M. Friedman, *Crime & Punishment in Am. History* at 38 (1993); 4 Blackstone, *Commentaries* at 251). Indeed, central to Blackstone's definition of recognizance is the same condition central to Smith's case: an obligation to refrain from breaking the law. A recognizance was "an obligation of record" entered in "some court of record" that requires a person "to do some particular act; as to appear at the assizes, *to keep the peace*, to pay a debt, or the like." *Id.* at 21 (citing 2 Blackstone, *Commentaries* at 9) (emphasis added).

Recognizances to "keep the peace" or "for good behavior" date back at least as far as the 14th century. *Id.* at 21. By the founding era, American judges used recognizances widely—so often that legal treatises contained stock forms. *Id.* at 22–23. One of "the most published and widely circulated" treatises in early-American legal use, *New Virginia Justice*, included fill-in-the-blank recognizances. *Id.* at 22 (quoting Nathaniel J. Berry, *Justice of the Peace Manuals in Virginia Before 1800*, 26 J.S. Legal Hist. 315, 328 (2018)). The forms looked like this:

Alexander Nairne
THE

NEW VIRGINIA JUSTICE,

August COMPRISING THE 26th 1796

OFFICE AND AUTHORITY

OF A

JUSTICE OF THE PEACE,

IN THE

Commonwealth OF VIRGINIA.

TOGETHER

WITH A VARIETY OF USEFUL PRECEDENTS
ADAPTED TO THE LAWS NOW IN FORCE.

To which is added,

An APPENDIX containing all the most approved forms of
Conveyancing, commonly used in this country,
Such as Deeds, of Bargain and Sale, of
Lease and Release, of Trust, Mort-
gages, &c.—Also the duties of
a Justice of the Peace aris-
ing under the laws of
the United States.

BY WILLIAM WALLER HENING,
Alexander ATTORNEY AT LAW. Nairne

RICHMOND: PRINTED BY T. NICOLSON, 1795.

438    SURETY FOR THE PEACE.

(D) *Recognizance for the peace or good behaviour.*

county to wit.
Be it remembered that on the     day of     in the year
A O, of     in the county aforesaid, yeoman, A S,
of the same place, yeoman, and B S, of the same place, yeo-
man, came before me one of the commonwealth's justices of
the peace for the county aforesaid, and acknowledged themselves
to owe to C M, esquire, governor or chief magistrate of the
commonwealth of Virginia, and his successors, to wit, the said
A O, the sum of     dollars, and the said A S, the sum of
dollars, and the said B S, the sum of     dollars, cur-
rent money of Virginia, to be respectively levied and made of
their several goods and chattels, lands and tenements, to the use
of the commonwealth aforesaid, if he the said A O, shall fail in
performing the condition underwritten.
    The condition of this recognizance is such, that if the above
bound A O, shall personally appear at the next court, to be hol-
den, in and for the county of     aforesaid, to do and receive
what shall then and there be enjoined him by the said court, and
in the mean time shall keep the peace [or, be of the good beha-
viour; or, shall keep the peace, and be of the good behaviour]
towards the commonwealth and all its citizens, and especially
towards A J, of  .  in the said county, yeoman:  Then the
said recognizance shall be void, or else remain in full force.

William Hening, *New Virginia Justice* at 25, 438 (1795) (available at:

https://bit.ly/3sNicUI). Here is a typed-out version, for readability:

| **Form Recognizance, 1795** |
|---|
| Be it remembered that on ___ the day of ___ in the year ___ AO, of ___ in the county aforesaid, yeoman, AS, of the same place, yeoman, and BS, of the same place, yeoman, came before me … and acknowledged themselves to owe to CM, esquire, governor, or chief magistrate of the commonwealth of Virginia, and his successors, to wit, the said AO, the sum of ___ dollars, and the said AS, the sum of ___ dollars, and the said BS, the sum of ___ dollars, current money of Virginia, to be respectively levied and made of their several goods and chattels, lands and tenements, to the use of the commonwealth aforesaid, if he the said AO, shall fail in performing the condition underwritten.<br><br>The condition of this recognizance is such, that if the above bound AO, shall personally appear at the next court, to be holden, in and for the county of ___ aforesaid, to do and receive what shall be then and there enjoined him by the said court, and in the meantime shall ***keep the peace [or, be of the good behavior; or, shall keep the peace, and be of the good behavior]*** toward the commonwealth and all its citizens … Then the said recognizance shall be void, or else remain in full force. |

The Framers of the Sixth Amendment would have been familiar with this procedure. Founding-era courts "made extensive use" of recognizances, an "integral" part of colonial law. Schuman, *supra* note 2, at 22 (citations omitted). The *New Virginia Justice* counted both James Madison and Thomas Jefferson among its subscribers:



William Hening, *New Virginia Justice* (1795) (listing subscribers at front of treatise, unpaginated).

Founding-era newspapers matter-of-factly discussed recognizances in criminal news of the day. For example, one Philadelphia paper, the Aurora General Advertiser (run by Benjamin Franklin's grandson, Franklin Bache) published a petition by the defendants in *Respublica v. Cobbett*, 3 U.S. 467, 475 (Penn. 1798), discussing their jury trial for breach of recognizances and complaint about jury-instruction error. Aurora Gen. Advertiser at 2 (Feb. 7, 1805) (No. 4401) (available at: https://bit.ly/3Z64Q1Q). Other newspapers reported on Aaron Burr "appear[ing] on the day mentioned in his

25

recognizance" when he ran into legal trouble in 1807 (unrelated to shooting Hamilton). *See* The Centinel No. 43 at 339 (Mar. 25, 1807) (available at: https://bit.ly/3ENh2eN) ("Col. Burr demanded a release from his recognizance"); Norfolk Gazette & Publick Ledger No. 136 at 3 (May 29, 1807) ("col. Burr should be relieved of his recognizance"). The term "recognizance" was everyday fare understood by the public at large.

These recognizances, widespread and well-known to the Framers, have multiple similarities with modern supervised release. At least five core functions overlap between the two.

**First**, recognizances operated like supervised release—imposing conditions and revocable release. "Every recognizance was [] 'subject to a *condition*,'" that might last until "the next court session, for a fixed period of time, or even for life." Schuman, *supra* note 2, at 24–25 (citations omitted). Courts often used the two particular conditions seen above in the *New Virginia Justice* form: "to keep the peace" and "be of good behavior." *Id.* at 25–26 (citing Bradly Chapin, *Criminal Justice in Colonial America* (1606–1660) at 27–28 (1983); *see also* 4 Blackstone, *Commentaries* at 251.

The two conditions were slightly different. A person could violate the keep-peace condition by violent crimes, "some act, as an affray, or battery, or the like." *Id.* at 26 (quoting 1 Edward Coke, *The Fourth Part of the Institutes of the Laws of England Concerning the Jurisdiction of the Courts* at 179 (1797)). The good-behavior condition was broader, barring a person from "scandals against good morals." *Id.* at 26 (quoting Hening, *New Virginia Justice*, at 440–41 (https://bit.ly/3sNicUI). In this case, Smith's supervision

condition to "not commit another federal, state, or local crime" (R. 188 at 2), was a direct descendent of the recognizance keep-peace conditions, while the restrictions meant to curb other undesirable behavior (like using drugs) (R. 188 at 2–3) were analogous to the old good-behavior condition.

**Second**, founding-era courts imposed recognizances as part of criminal sentences—precisely like modern courts impose supervised release. In his article, Professor Schuman catalogs early American treatises listing recognizances attached to criminal sentences, Schuman, *supra* note 2, at 27 (citing 4 Blackstone, *Commentaries* at 251) (additional citation omitted), court opinions holding that judges had "inherent power to take recognizance for good behavior after conviction," *id*. at 27–28 (citing *Commonwealth v. Davies*, 1 Binn. 97, 98 n. a (Pa. 1804)), and state laws empowering judges to impose recognizances for numerous crimes, *id*. at 27–28. Professor Schuman cites widespread use of postconviction recognizances in the courts of Philadelphia, New York, Virginia, Maryland, Connecticut, and New England. *Id*. at 28–29. As Blackstone wrote in his *Commentaries*, the "requisition of sureties"—recognizances—were "part of the penalty inflicted" after conviction for various offenses. 4 Blackstone, *Commentaries* at 251.

**Third**, recognizances, like supervised release, came with surveillance and reporting. As part of the process, judges required recognizors to find sureties—third parties who were "expected to exercise some supervision over the bonded person,"

including arresting a breaching recognizor and delivering him to court to be incarcerated. Schuman, *supra* note 2, at 29 (citation omitted).

**Fourth**, for defendants who violated recognizance conditions, courts could and did impose jail—like supervised release. *See Haymond*, 139 S. Ct. at 2396 (Alito, J., dissenting) (violating recognizance can result in "a loss of liberty"). The process was framed as a debt, but functionally courts could levy impossible recognizance amounts. Schuman, *supra* note 2, at 32 ("Typically, however, violators could not afford to pay.") (citation omitted). As Professor Schuman writes, judges used recognizances effectively as warrants by "sometimes order[ing] recognizors to pledge enormous sums of money that no one in the community could have realistically afforded," and thereby "keep them in prison" with no ability to pay. *Id.* at 33 (quoting Thomas Raeburn White, *Commentaries on the Constitution of Pennsylvania*, 111 (1907)) (internal quotes omitted) (additional citations omitted). Even if a person was able to pay the debt and thereby avoid jail, a judge could simply order "another recognizance and then imprison them for failing" to pay the new one. *Id.* at 32.

**Fifth**, the two schemes share the same purpose: public protection. Courts imposed recognizances conditioned on good behavior "to prevent criminal actions by the defendant"—the purpose "was to prevent crimes, or public wrongs, and misdemeanors, and for no other purpose." *Republica v. Cobbett*, 3 U.S. 467, 475 (Penn. 1798). Courts understood that recognizances were self-evidently "of a criminal nature" and their purpose identical to modern supervised release. *See id.*

In short, Founding-era recognizances were a common and well-known analogue to modern supervised release.

>    **2.    Contrary to Justice Alito's dissent, the Framers understood defendants facing recognizance forfeiture to have Sixth Amendment rights.**

In his dissent, Justice Alito saw "no evidence that there was a right to a jury trial" at recognizance proceedings and, without such evidence, concluded that the original scope of the Sixth Amendment couldn't encompass something like supervised release. *Haymond*, 139 S. Ct. at 2398 (Alito, J., dissenting). At the time, he was right—there had been virtually nothing written on the topic. That has changed because of post-*Haymond* scholarship.

New research shows that unequivocally "yes, at the time the Constitution was ratified, recognizance forfeitures required a jury trial." Schuman, *supra* note 2, at 34. The evidence is ample. Professor Schuman found numerous cases discussing recognizance juries:

| Cite | Jury Trial |
|---|---|
| *Mix v. People*, 29 Ill. 196, 197–98 (1862) | "upon a common recognizance . . . . The verdict of the ***jury*** was . . . for the plaintiff" |
| *Regina v. Harmer*, 1859 WL 9677 (U.C. Q.B. 1859) | "upon this recognizance . . . . The defendant pleaded, that he did not . . . in any way break the peace . . . [and] was tried in that court by a ***jury***, on the 14th of September 1858, and was found guilty of the said assault." |
| *Sans v. People*, 3 Gilman 327, 329 (Ill. 1846) | "[A] scire facias issued against him, and . . . his security . . . The ***jury*** returned a |

| | |
|---|---|
| | verdict against the plaintiff, upon which judgment was rendered by the court." |
| *Rex v. Wiblin*, 2 Car. & P. 9 n. 2 (1825) | "When a person has entered into a recognizance to keep the peace . . . . If the ***jury*** find that the recognizance has been forfeited, they find a verdict for the crown, and judgment is entered up." |
| *Commonwealth v. Emery*, 2 Binn. 431, 433–35 (Pa. 1810) | "The objections are, that the evidence given to the ***jury*** was not a recognizance, but only a loose note . . . . But I see nothing illegal or dangerous in the[] practice of taking and certifying recognizances by short minutes, or in permitting those minutes to be given in evidence to ***juries***, as often as questions arise on the recognizances." |
| *Commonwealth v. Davies*, 1 Binn. 97, 99–100 (Penn. 1804) | "The point which led ultimately to the present argument . . . was this, that unless the ***jury*** might find less than the whole amount, and this it was said they could not do, a recognizance of this kind if forfeited by a libel would prove a direct restraint upon the press." |

Beyond judicial opinions, long-preserved court records show defendants received recognizance juries as far back as the 15th century. Schuman, *supra* note 2, at 35 (citing The Year Books: Report #1494.073, *Legal History: The Year Books, Boston University School of Law*) (available at: https://bit.ly/3ErE8Y7). Treatises show that English courts in the 1600s and 1700s would empanel a "jury" to decide whether a defendant "forfeited his recognizance by breach of the peace." *Id.* at 35. American courts were the same:

Professor Schuman highlights sample cases from 1725, 1771, 1798, 1800, and 1801. *Id.* at 36–37.

In short, the Framers of the Sixth Amendment understood that the ancient jury-trial right passed down through English law for centuries guaranteed juries to anyone accused of breaching their recognizance conditions. This understanding influenced the types of proceedings that the Framers meant to protect when framing the Sixth Amendment.

### 3. Justice Gorsuch correctly identified a "structural difference" between supervised release versus probation or parole.

The history of the forfeiture jury also supports the *Haymond* plurality's conclusion that supervised release is structurally different from probation or parole. When the constitution was ratified, the common law required juries for recognizance forfeitures because recognizance was structured as an additional sentence. Schuman, *supra* note 2, at 49.

Then, during the 1800s, the systems of community supervision slowly changed. Beginning in the 1830s, judges who had long relied on recognizances began slowly adopting a new practice called "laying a case on file," which was simply to postpone sentencing indefinitely. *Id.* at 41–42; *see also Ex Parte U.S.*, 242 U.S. 27, 50 (1916) (discussing "a system styled 'laying the case on file'"). Later developments, like the development of parole and the formalization of "laying a case on file" into "probation," further changed the structure of community supervision from an additional penalty to a

withheld punishment. This change is the reason why the forfeiture jury disappeared during the 19th century. *See* Schuman, *supra* note 2, at 49. Revocation of these newer forms of supervision was merely reinstatement of a prison term that had been "imposed previously", not a new punishment necessitating a jury. *Gagnon*, 411 U.S. at 782 n.3

For federal supervised release, Congress intended to switch back to version of supervision that was like old-fashioned recognizances and unlike the withheld-punishment models of parole and probation. Prior to the Sentencing Reform Act, the parole system was premised on the idea that prison was rehabilitative. *Tapia*, 564 U.S. at 324. But in the final quarter of the twentieth century, lawmakers started to doubt the prison system's ability to rehabilitate inmates. *Mistretta*, 488 U.S. at 365. In part to reject the rehabilitative model, Congress abolished parole. *Mistretta*, 488 U.S., at 365. Now, federal inmates can no longer obtain early relief from their prison sentences through parole. And Congress wrote the Sentencing Reform Act to emphasize that supervision is structurally different from parole.

Because a federal parole board can no longer set aside part of a defendant's prison sentence, the Sentencing Reform Act stripped courts of any power to order rehabilitative programming for imprisoned persons. *Tapia*, 564 U.S. at 325–26. Prison sentences are now determinate and exclusively for the purposes of retribution, deterrence, and incapacitation. *Id.*; 18 U.S.C. §§ 3553(a)(2), 3582(a). Courts can still address rehabilitative concerns through a *separate* term of supervised release, and courts remain empowered to order rehabilitative programming for supervisees. 18 U.S.C. § 3583(c);

*Tapia*, 564 U.S. at 330. But Congress made sure to create a firewall between a prison sentence, which is punitive and "not an appropriate means of promoting correction and rehabilitation," 18 U.S.C. § 3582(a), and a supervised-release sentence, which is rehabilitative but cannot be part of a defendant's punishment, 18 U.S.C. § 3583(c). Two separate terms serving two separate purposes.

And that's the dispositive difference. Defendants on traditional parole or probation were relieved from their prison sentences and owed a balance for withheld punishment. With a debt outstanding, courts correctly reasoned that revocations were not "prosecutions" under the Sixth Amendment but rather the mere "administration of a sentence," as Judge Alito argued. *Haymond*, 139 S. Ct. at 2394. But federal supervision is doctrinally separate from a defendant's punishment. "Unlike parole, which replaced a portion of a defendant's prison sentence, supervised release is a separate term." *Johnson v. United States*, 529 U.S. 694, 725 (2000)) (Scalia, J., dissenting). "Supervised release does not shorten prison time; instead it imposes restrictions on the prisoner to take effect upon his release from prison." *United States v. Thompson*, 777 F.3d 368, 372 (7th Cir. 2015). Citizens on federal supervision thus do not owe any balance of imprisonment. When a defendant starts his first day of supervised release, he does so only "after the completion of his prison term," owing not a single day in prison for his original offense. *See Haymond*, 139 S. Ct. at 2382 (citing U.S. Sent. Comm'n, Guidelines Manual, ch. 7, pt. A(2)(b) (Nov. 2012) and Fiona Doherty, *Indeterminate Sentencing Returns: The Invention of Supervised Release*, 88 N.Y.U. L. Rev. 958, 1024 (2013)).

Justice Gorsuch recognized this distinction: "unlike parole, supervised release wasn't introduced to replace a portion of defendant's prison term." *Haymond*, 139 S. Ct. at 2382. This "structural difference"—the change from a balance-owed to a no-balance system—bares "constitutional consequences." *Id*. In that respect, supervised release shares more in common with recognizances than parole—in both systems, the defendant owes no balance for withheld punishment.

Here is a chart of the types of structural differences Justice Gorsuch was talking about:

| | Year invented | Relationship to prison sentence | Effect on prison sentence | Jury required at revocation? |
|---|---|---|---|---|
| **Recognizance** | 1361 | Imposed in addition to prison | None. Served in addition to sentence | Yes |
| **Laying a case on file** | 1820s | Delayed/postponed sentencing | Delay of prison sentence | No |
| **Probation** | 1841 | Imposed in lieu of prison | Delay of prison sentence | No |
| **Parole** | 1836 | Imposed upon early release from prison | Suspension of prison sentence | No |
| **Supervised Release** | 1984 | Imposed in addition to prison | None. Served after prison sentence | <u>Yes</u> |

The Framers of the Sixth Amendment intended to create procedural protections for postconviction recognizances, a system matching supervised release in form, function, and purpose. The two need not be identical—indeed, historical practices rarely are. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2133 (2022) ("[A]nalogical reasoning requires only . . . a well-established and representative historical

analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough.”). But as the chart above shows, recognizances and supervised release are strikingly similar. Because of that similarity, supervisees should receive the same constitutional protections their forebears possessed, nothing less.

### 4. The Sixth Amendment is a bundle of rights.

Most of the case law and history cited above regards the Sixth Amendment’s jury right, the specific right at issue in *Haymond*. Smith did not assert his right to a jury during the revocation hearing, only a right to confrontation. Accordingly, Smith recognizes that any argument that he should have received a jury trial would be forfeited and unlikely to succeed on plain-error review.

Smith’s Confrontation Clause argument, however, is fully preserved. And because the Sixth Amendment encompasses a bundle of rights related to criminal prosecutions, Smith’s claim under the Confrontation Clause has just as much merit as a post-*Haymond* trial demand.

The Framers adopted the Sixth Amendment to protect a system of interrelated trial rights, including the right to a speedy trial, public proceedings, and an impartial jury. *Haymond*, 139 S. Ct. at 2376. The Framers also intended to dictate *how* criminal trials should proceed, writing the Confrontation Clause to proscribe “a procedure for determining the reliability of testimony in criminal trials.” *Crawford v. Washington*, 541 U.S. 36, 67 (2004). This is because the Sixth Amendment requires not just any trial, but a

trial with the same protections that historically applied at the time of the founding. *Oregon v. Ice*, 555 U.S. 160, 170 (2009); *Apprendi v. New Jersey*, 530 U.S. 466, 478 (2000). Indeed, Justice Alito's opinion in *Haymond* saw the Sixth Amendment as a package deal, recognizing that a jury for revocation proceedings would also requires courts to "try all those proceedings in accordance with the Sixth Amendment's Confrontation Clause." *Haymond*, 139 S. Ct. at 2388 (Alito, J., dissenting). *See also id.* at 2394–95 (collecting jury-right, speedy trial, and confrontation cases as all relevant to Sixth Amendment analysis).

Smith did not need to request a jury to take advantage of the Sixth Amendment's other protections. Criminal defendants are generally free to waive their jury right and proceed to a bench trial when they would rather have a judge act as factfinder. *See United States v. Williams*, 559 F.3d 607, 609 (7th Cir. 2009). And a defendant who waives a jury is entitled to the same confrontation rights during a bench trial as would apply in front of a jury. *See, e.g., Davis v. Washington*, 547 U.S. 813, 820, 829–33 (2006) (affidavit admitted at bench trial violated Confrontation Clause). Smith deserved Confrontation Clause protection in this case even without a jury present.

D.     **Smith's right to confrontation, embodied in the Sixth Amendment, was violated here.**

The hard task for this Court is determining whether the Sixth Amendment applies to Smith's revocation proceeding. After determining that the Sixth Amendment applies, application of the Confrontation Clause is easy. Smith's confrontation rights were violated multiple times during his revocation hearing.

First, all of Probation Officer Jones's video testimony violated the Sixth Amendment. Witness testimony by video sits in the nether zone between Rule 32.1(b)(2)(C) and the Confrontation Clause. The district court allowed Jones to testify remotely because it concluded, correctly, that remote video testimony would be admissible under the Fifth Amendment and federal rules. *See Jordan II*, 765 F.3d at 787. But the Confrontation Clause is more restrictive and "guarantees the defendant a *face-to-face* meeting with witnesses appearing before the trier of fact." *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988) (emphasis added). The Sixth Amendment does not allow video testimony except in exceptional circumstances (*e.g.*, young child victims who cannot safely face an abuser) that do not apply here. *See Maryland v. Craig*, 497 U.S. 836, 844 (1990).

Likewise, the third-party lab reports showing Smith's drug-test results violated the Confrontation Clause. This Court has "repeatedly held that the government may not introduce forensic laboratory reports or affidavits reporting the results of forensic tests and use them as substantive evidence against a defendant unless the analyst who prepared or certified the report is offered as a live witness subject to cross-examination." *United States v. Webster*, 775 F.3d 897, 901 (7th Cir. 2015) (collecting cases) (internal quotation omitted). *See also Bullcoming v. New Mexico*, 564 U.S. 641 (2011). Here, the government relied on third-party reports stating that Smith's urine had tested positive for marijuana. (App. at 18, 25–26, 28.) But it never presented for cross examination the lab techs who prepared the reports—or, for that matter, *any* forensic expert who could explain the methods used to test Smith's urine for drugs. And although the reports generated in a

black box, the government disavowed any nontestimonial use for this hearsay. (App. at 20.)

Smith's confrontation rights were further violated when the government put forth evidence of the alleged high-speed chase in Indiana and Michigan. Two officers testified about those events. (App. at 42–64.) But Williams—the officer who engaged in the actual chase—admitted that he never saw the car's occupants and relied only on others' representations that Smith was the driver. (App. at 63–64.) Officer Rush testified that he identified Smith prior to the chase. (App. at 45–46.) But Smith challenged that testimony during the hearing. During cross, Smith questioned whether Rush had a predisposition to identify Smith because Rush was already expecting a white Chevy Malibu. (App. at 53.) Smith also pointed out that Rush's partner gave inconsistent descriptions of the car's occupants, even though Rush admitted that his partner had a better view of the car than he did. (App. at 52–53.) And finally, Smith himself testified about how he tried to turn himself in after he learned that marshals were looking for him—thus, undercutting the government's theory that Smith was trying to evade police. (App. at 66–67.)

The government relied on hearsay testimony to bolster Rush's identification of Smith. Rush insisted that his partner had also positively identified Smith. (App. at 44, 53.) Rush also described third-hand accounts from the U.S. Marshals that a warrant was out for Smith's arrest, and that Smith was expected in a specific location and vehicle. (App. at 43–44.) All of this information, both Rush's challenged identification and the hearsay evidence used to support it, combined to help the government prove the violation.

38

Indeed, the court cited Rush's partner as evidence that Rush accurately identified Smith. (App. at 71.)

Smith did not object to every utterance of hearsay from Rush, but Smith did not forfeit his challenges because he had already made a thorough record of his assertion that the Confrontation Clause applied. (App. at 9–10, 21, 26, 28, 32.) Smith could not be expected to repeatedly assert the same objections, even after the court had repeatedly shot them down. *See United States v. Paul*, 542 F.3d 596, 599 (7th Cir. 2008) ("Once a court has conclusively ruled on a matter, it is unnecessary for counsel to repeat his objection in order to preserve it for appeal."). The issue here is binary: either the Confrontation Clause applies to all of the hearing, or it applies to none of it.

And a ruling that the Sixth Amendment does not apply would condemn defendants like Smith to a potential lifetime without jury rights. The drug-trafficking statute, 21 U.S.C. § 841, allows life-long terms of supervised release. Thus, any minor violation— missing a single drug test—allows imposition of a new lifetime term. *See* 18 U.S.C. § 3583(h). Smith and other defendants like him can be effectively stripped of their trial rights *for life* under the notion that they are never being punished for new offenses. And without constitutional protection, "Congress could require anyone convicted of even a modest crime to serve a sentence of supervised release for the rest of his life. At that point, a judge could try and convict him of any violation of the terms of his release under a preponderance of the evidence standard, and then sentence him to pretty much anything." *Haymond*, 139 S. Ct. at 2380. The Sixth Amendment cannot allow this.

A potentially life-long suspension of the Sixth Amendment not only erodes the rights of criminal defendants, it also undermines the people's ability to put a check on governmental overreach. "Just as the right to vote sought to preserve the people's authority over their government's executive and legislative functions, the right to a jury trial sought to preserve the people's authority over its judicial functions." *Haymond*, 139 S. Ct. at 2375 (citing J. Adams, Diary Entry (Feb. 12, 1771), in 2 Diary & Autobiography of John Adams 3 (L. Butterfield ed. 1961). Thus, the Framers considered the jury trial "the heart and lungs, the mainspring and the center wheel" of our liberties, without which "the body must die; the watch must run down; the government must become arbitrary." *Id.* (citing Letter from Clarendon to W. Pym (Jan. 27, 1766), in 1 Papers of John Adams 169 (R. Taylor ed. 1977)). Federal courts have the formidable obligation to police themselves and protect the American public's "constitutional authority to set the metes and bounds of judicially administered criminal punishments." *Id.* at 2378. This Court should use this case to restore the public to its rightful place.

This Court should hold that the Sixth Amendment applies to proceedings for revocation of supervised release, vacate Smith's revocation, and remand for proceedings consistent with the Constitution.

## II. The district court also violated the Fifth Amendment and federal rules when it accepted hearsay evidence without balancing the parties' interests.

### A. Standard of review

The district court erred by admitting hearsay without conducting the balancing test required by Rule 32.1(b)(2)(C). The standard of review for this claim is an open

question in this Court. *United States v. Falls*, 960 F.3d 442, 445 (7th Cir. 2020). Smith's claim succeeds under any standard but, under normal rules for standards of review, this Court should review this claim *de novo*.

Although the admissibility of evidence is normally a matter of judicial discretion, this Court reviews *de novo* the legal question of whether a trial court applied the correct test before exercising its discretion. *Compania Administradora de Recuperacion v. Titan Int'l, Inc.*, 533 F.3d 555, 559 (7th Cir. 2008). Likewise, the correct interpretation of the Federal Rules of Criminal Procedure is also a matter of law reviewed *de novo*. *United States v. Lee*, 77 F.4th 565, 575 (7th Cir. 2023). The same standard applies to the purely legal question presented here. *See United States v. Lloyd*, 566 F.3d 341, 344 (3d Cir. 2009) (*de novo* review of claim that court applied Rule 32.1 incorrectly).

### B.    Legal standard

Separate from the Sixth Amendment, the Fifth Amendment's due process clause gives defendants basic procedural protections during revocation proceedings. *Boultinghouse*, 784 F.3d at 1171 (citing *Gagnon*, 411 U.S. at 786, and *Morrissey*, 408 U.S. at 487–89). These basic protections are codified in Federal Rule of Criminal Procedure 32.1, *id.,* and include the accused's right to confront and cross-examine witnesses against him. *United States v. Jordan ("Jordan I")*, 742 F.3d 276, 279 (7th Cir. 2014). A defendant must be allowed to "question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." FED. R. CRIM. P. 32.1(b)(2)(C).

Before accepting hearsay at a revocation hearing, Rule 32.1(b)(2)(C)'s "interest of justice" provision requires a court "explicitly to balance the defendant's constitutional interest in confrontation and cross-examination against the government's stated reasons for denying them." *Jordan I*, 742 F.3d at 280. Under this circuit's "bright-line" interpretation of the rule, the record must include an *explicit* application of the balancing test. *United States v. Moslavac*, 779 F.3d 661, 664 (7th Cir. 2015). An implied consideration of each party's interests is insufficient. *Id.*

Accordingly, although not as robust as the constitutional guarantees of the Confrontation Clause, the interest-balancing requirement of Rule 32.1(b)(2)(C) still has teeth. *See, e.g., Jordan I*, 742 F.3d at 282 (remanding for application of balancing test); *Moslavac*, 779 F.3d at 663–64 (vacating when court accepted hearsay without explicitly conducting test, even though it found evidence reliable); *United States v. Kersee*, --F.4th--, No. 23-20381, 2023 WL 7982576, at *3 (5th Cir. Nov. 17, 2023) (due process violated when government relied on hearsay statements recounted in criminal complaints to obtain revocation).

### C.    Application

The district court violated Rule 32.1(b)(2)(C)'s bright-line rule in this case. As explained above in Section I.D, the court accepted multiple forms of hearsay throughout the proceeding. The court failed to apply the correct balancing test before doing so. And the improperly accepted evidence was key for the government to prove both Smith's drug-use violations and his new-crime violation.

The district court overruled Smith's objection to the lab reports because the court "infer[red]" that the lab had a contract with the probation office, which the court reasoned allow an additional "inference" that the lab used "reasonable scientific principles and methods." (App. at 21.) The government did not submit any evidence about a longstanding relationship between the probation office and the lab, nor any evidence of the lab's methods. But even if the court were correct in concluding that the lab results were reliable—a conclusion based on inferences upon inferences—that conclusion alone would not be sufficient to admit the reports. "[R]eliability cannot be the beginning and the end of the interest of justice analysis under Rule 32.1(b)(2)(C)." *Jordan I,* 742 F.3d at 280. The court needed to weigh Smith's interest in cross-examining the reports' authors against the government's excuse for not calling the witness to court. *Id.* It failed to do so.

Later in the hearing, the court clarified that it had overruled Smith's objections to the lab reports because it believed that "Courts have recognized that chemists are hard to come by and so we don't haul them out for everything." (App. at 34.) But that type of generalized justification (*i.e.*, the general inconvenience of corralling busy professionals) is the exact type of "troubling" excuse that this Court warned would be insufficient in *Jordan II. See* 765 F.3d at 787–88. Generic concerns about inconvenience are not enough to excuse the admission of hearsay evidence; courts must conduct the balancing of the interests required by Rule 32.1(b)(2)(C). *Id.* Even when inconvenient, a defendant's liberty interest will ordinarily require "substantial efforts" to bring a witness in for

confrontation before resorting to hearsay documents. *Id.* The court should not have admitted the reports based only on their assumed reliability, and without considering whether the potential inconvenience of bringing in the lab technician was substantial enough to overcome the defendant's interest in avoiding prison.

The district court also accepted hearsay evidence on Smith's more serious violation of committing a new crime in Indiana. If the district court had conducted the required balancing test, it would have needed to reject this evidence too. Smith has a strong liberty interest in avoiding revocation, which is "not to be taken lightly." *Jordan I*, 742 F.3d at 279. "Where, as here, a person's liberty is at stake, the opportunity to confront witnesses and reveal problems with their testimony is an important component of due process. When liberty is at stake, the limited right to confront and cross examine adverse witnesses should not be denied without a strong reason." *Id.* Smith's interests were particularly strong in this case because committing a new offense is a Grade B violation, U.S.S.G. § 7B1.1(a)(2), for which the guidelines say revocation should be automatic, U.S.S.G. § 7B1.3(a)(1). *See also Kersee*, 2023 WL 7982576, at *3 (supervisee's interest in confrontation is heightened when facing a Grade A or B violation). Rush's identification was the only thing tying Smith to this violation. As explained above, Smith had grounds to challenge Rush's identification (and attempted to do so). The only way that the government was able to bolster Rush's testimony was with Rush's third-hand accounts that other officers had also identified Smith. (App. at 44–45.)

Again, the district court did not conduct a balancing test before admitting hearsay recollection from Rush's partner or other officers. Nor did the government provide any evidence that it would have been unduly burdensome to call the other officers. On the contrary, as revealed earlier in the hearing, the government assumed that reliability alone was always a good enough reason to submit hearsay at revocation. (App. at 34.) But reliability alone is not enough. *Jordan I,* 742 F.3d at 280. Nothing suggests that it would have been unduly burdensome, for example, for the government to call Rush's partner to testify in person. Without applying the proper test, the district court should not have relied on hearsay testimony to find Smith guilty of the high-speed chase.

Accordingly, even if this Court does not adopt the Sixth Amendment for revocation proceedings, it should still vacate the revocation judgment for the district court's failure to follow Rule 32.1(b)(2)(C).

## III. The court erred by adjudicating Smith guilty for a violation that the government dismissed.

### A. Standard of review

The scope of the prosecution's discretion in charging decisions is a legal matter reviewed *de novo*. *See United States v. Baldwin*, 68 F.4th 1070, 1073 (7th Cir. 2023). This Court also reviews *de novo* a claim that the district court relied on inaccurate information at sentencing. *United States v. Miller*, 900 F.3d 509, 513 (7th Cir. 2018).

### B. Legal standard

Two legal principles are potentially relevant to this claim.

First, in a criminal proceeding, a district court should consider only the charges and allegations that the government submits. We litigate in an "adversarial system of adjudication," which relies "on the parties to frame the issues" and on courts as "neutral arbiter[s] of matters the parties present." *U.S. v. Sineneng-Smith,* 140 S. Ct. 1575, 1579 (2020). And as part of this adversarial system, prosecutors—not judges—have broad discretion to decide which charges to pursue. Courts may review exercises of prosecutorial discretion, like "decisions to file or dismiss charges", only when necessary "to ensure that the prosecutor does not violate the Constitution or some other rule of positive law." *In re U.S.*, 503 F.3d 638, 642 (7th Cir. 2007). *See also, e.g., United States v. Cejas*, 761 F.3d 717, 732 (7th Cir. 2014).

Second, criminal defendants have a due process right to be sentenced based on accurate information. *United States v. Tucker*, 404 U.S. 443, 447 (1972); *United States v. Oliver*, 873 F.3d 601, 608–09 (7th Cir. 2017). A defendant's burden in making an inaccurate-information claim is "low" and requires "only that 'false information was part of the basis for the sentence.'" *Miller*, 900 F.3d at 513 (7th Cir. 2018) (quoting *United States v. Barnes*, 907 F.2d 693, 696 (7th Cir. 1990), and *U.S. ex rel. Welch v. Lane*, 738 F.2d 863, 865 (7th Cir. 1984)). Harmless-error review does not apply. *Id.* at 514 (citing *Welch*, 738 F.2d at 868).

## C.   Application

The probation office's violation report accused Smith of three violations based on the commission of new crimes: one in Indiana, one in Michigan, and one in Ohio. (R. 188

at 2.) Then, at the revocation hearing, the government announced it would pursue the Indiana offense only and drop the other two. (App. at 8–9.) The government went on to present testimony from Indiana police officers, but no witnesses from Michigan or Ohio. Strangely, however, the district court's written judgment found Smith guilty of violations in both Indiana *and* Michigan. (App. at 88.) The defense sees two alternative explanations for this disconnect, either of which requires a remand for resentencing.

First, the court may have intentionally included the Michigan violation in the judgment because it concluded that the government adequately proved the violation. The probation officer's report of violations suggests that Smith's Indiana and Michigan charges stemmed from the same incident, in which Smith allegedly led police on a high-speed chase across state lines. (R. 188 at 2.) And evidence at the hearing included testimony that Indiana police chased a car into the Michigan border. (App. at 60–62.) The court had a reasonable basis to conclude that, if the Indiana charge was adequately proved, the Michigan one was too. Indeed, the court hinted at this interpretation of the record, saying it chose the sentence based on a finding that "Mr. Smith led police from *two* states on a very high-risk 27-minute police chase." (App. at 80) (emphasis added).

But regardless of the court's view of the evidence, the court could not overrule the government's decision to dismiss the Michigan violation. The prosecution is empowered to choose which violations to pursue. *Cejas*, 761 F.3d at 732. And a court cannot interfere with the government's decision to dismiss a charge absent extraordinary circumstances like racial discrimination or some other unconstitutional motive. *In re U.S.*, 503 F.3d at

47

642. The district court did not make any findings like that here, nor does the record suggest it could.

Second, and perhaps more likely, the court may have simply made a mistake. The parties entered the revocation hearing with 13 potential violations on the table. (R. 188 at 2–3.) By the end of the hearing, the government had given up on eight of them. (App. at 8–9, 36, 68.) A lot was going on. Because the government put up evidence about Smith allegedly fleeing to Michigan and abandoning a car in that state (App. at 60–62), the court may have lost track of the alleged violations and thought the government pressed forward with that charge too.

If the court misunderstood that the Michigan violation was still on the table, then that misunderstanding requires remand. Smith was entitled to a sentencing based on accurate information. *Oliver*, 873 F.3d at 608–09. And Smith does not need to show prejudice from the court's misunderstanding, only that the court's misunderstanding was a factor in his sentence. *See Miller*, 900 F.3d at 514. An extra Grade B violation is a big factor for the court to mistakenly rely on. Smith easily meets the "low" bar necessary for remand here. *Id.* at 513.

Thus, whatever reason the court added the dismissed violation back to the case, this Court should remand for resentencing without consideration of the Michigan charge.

**IV.** **The written judgment must be amended to match the district judge's oral pronouncement.**

**A.** **Standard of review**

This Court reviews *de novo* an inconsistency between an oral and written judgments. *United States v. Johnson*, 765 F.3d 702, 710 (7th Cir. 2014).

**B.** **Legal standard**

A sentencing judge's oral pronouncement—not the written judgment—is the defendant's "actual sentence**."** *United States v. Harris*, 51 F.4th 705, 720 (7th Cir. 2022). If there is a conflict between the written judgment and a judge's statements, an unambiguous oral pronouncement will always trump the written judgment. *Johnson*, 765 F.3d at 711.

When an oral pronouncement is ambiguous, this Court may consider the entire record, including the written judgment, to resolve the ambiguity. *United States v. Medina-Mora*, 796 F.3d 698, 700 (7th Cir. 2015). But this Court should resort to the written judgment only when the district judge's comments at sentencing are truly ambiguous. When context from the rest of the sentencing hearing makes clear the judge's intent, then the oral statements alone determine the defendant's sentence. *See id.* (rejecting government's argument that court's use of word "concurrent" was ambiguous when defendant had no other federal charges, and context implied that sentence should be concurrent to state charges).

**C.** **Application**

The written judgment conflicts with the court's oral judgment in two ways.

First, the written judgment adjudicates Smith guilty for "Mandatory Condition No. 1, Violation No. 3", the alleged Michigan offense violation (R. 196 at 1), even though the government dismissed that violation, and the court did not find that Smith committed that violation (App. at 9–10, 73.) As explained in Section III, this Court should remand for resentencing because the court may have erroneously relied on this dismissed violation when choosing a sentence. But in the alternative, if this Court concludes that the district judge unambiguously dismissed that violation and only included it in the judgment because of a scrivening error, then this Court should remand with instructions to remove the violation from the written judgment.

Second, as part of the sentence, the court recommended that "the Bureau of Prisons designate as the place of the defendant's confinement a facility that can address the defendant's potential colon cancer." (App. at 87.) But the written judgment drastically weakens this recommendation, suggesting only that the Bureau place Smith some place where he can receive "medical treatment for his medical conditions." (App. at 90.) And even then, the written judgment recommends such placement only if otherwise "consistent with the defendant's security classification." (App. at 90.)

The judge's recommendation, as impermissibly amended through the written judgment, is meaningless. All prisoners have a constitutional right to receive treatment for "medical conditions." (App. at 90.) *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The written judgment asks prison officials do what they are already required to do. In contrast, the judge's oral ruling was more meaningful: It flagged a specific and serious

condition (potential colon cancer) of which prison officials needed to be aware. (App. at 87.) The written judgment should be amended to include the recommendation that Smith be placed in a facility that can adequately address this potential colon cancer, as the judge promised during the hearing.

## Conclusion

This Court should hold that the Sixth Amendment applies to proceedings for revocation of supervised release, vacate Smith's revocation, and remand for proceedings consistent with the Constitution. Alternatively, this Court should vacate the judgment because the district court admitted hearsay testimony without conducting the balancing test required by Federal Rule of Criminal Procedure 32.1(b)(2)(C).

If this Court does not vacate the revocation on either of those grounds, it should nonetheless remand for resentencing because (1) the court adjudicated Smith guilty for a violation that the government dismissed, and (2) the written judgment does not match the oral sentence.

Respectfully submitted,
THOMAS W. PATTON
Federal Public Defender

s/ Michael Will Roy
MICHAEL WILL ROY
Assistant Federal Public Defender

Attorneys for Defendant-Appellant,
JASON L. SMITH

**Certificate of compliance with Fed. R. App. P. 32(a)(7)(B)**

The undersigned certifies that this brief complies with the volume limitations of

Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Circuit Rule 32 in that it contains

12,542 words as shown by Microsoft Word for Microsoft 365 used in preparing this brief.

s/ Michael Will Roy
MICHAEL WILL ROY
Assistant Federal Public Defender

Dated: December 11, 2023

No. 23-2449

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

vs.

JASON L. SMITH,
Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Indiana
Case No. 3:10-CR-00107
The Honorable Judge Robert L. Miller

REQUIRED SHORT APPENDIX OF
DEFENDANT-APPELLANT, JASON L. SMITH

FEDERAL PUBLIC DEFENDER
CENTRAL DISTRICT OF ILLINOIS
300 W. Main Street
Urbana, Illinois 61801
Telephone:   (217) 373-0666
Fax:          (217) 373-0667
Email: Michael_Roy@fd.org

THOMAS W. PATTON
Federal Public Defender

MICHAEL WILL ROY
Assistant Federal Public Defender

Attorneys for Defendant-Appellant,
JASON L. SMITH

**Certificate of compliance with Circuit Rule 30**

The undersigned counsel for Defendant-Appellant, hereby states that all of the materials required by Circuit Rule 30(a) and 30(b) are included in the Appendix to this brief.

s/ Michael Will Roy
MICHAEL WILL ROY
Assistant Federal Public Defender

Date: December 11, 2023

# Appendix table of contents

                                                                    **Page**

Certification ........................................................................................... ii

Order granting motion to present testimony by video, July 14, 2023 ................................... 1

Revocation Hearing Transcript, July 17, 2023 ...................................................... 4

Revocation Judgment, July 17, 2023 ................................................................. 88

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| JASON L. SMITH | ) | |
| | ) | |
| *Petitioner,* | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:10-cr-107 |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| *Respondent.* | ) | |

<u>ORDER</u>

Originally sentenced in April 2011, Mr. Smith served his term of imprisonment and began his 36-month term of supervised release in June 2022. In March 2023, the probation office filed a petition for warrant for offender under supervision for Mr. Smith's alleged violations of supervised release, and the petition for warrant was amended a few months later. [Doc. Nos. 175, 185]. The court set a final revocation hearing for July 17, 2023. As part of its presentation of evidence, the government plans on calling probation officer Abram Jones. The government moves for permission to present Probation Officer Jones's testimony via video conference at Mr. Smith's revocation hearing over Mr. Smith's objection.

Mr. Smith is entitled to "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear" for his revocation hearing. Fed. R. Crim. P. 32.1(b)(2)(C). Federal Rule of Criminal Procedure 32.1(b)(2)(C) expressly allows the court to excuse a witness's appearance altogether, whether physical or virtual, in the interests of justice, despite the otherwise strong

1

preference for live, in-person testimony. United States v. Jordan, 765 F.3d 785, 787 (7th Cir. 2014). In considering the government's motion, the court must evaluate whether Probation Officer Jones's appearance via video conference is in the interests of justice. Id.;Fed. R. Crim. P. 32.1(b)(2).

In weighing the interests of justice, the Seventh Circuit has explained that "when live testimony is difficult or burdensome to obtain, the confrontation need not be face-to-face." United States v. Jordan, 742 F.3d 276, 278 (7th Cir. 2014); see also United States v. Wright, No. 11-40024-01-DDC, 2019 WL 2226121, at *4 (D. Kan. May 23, 2019)(determining that a Bureau of Prisons employee who lived and worked out of state could testify via video-conference for the defendant's revocation hearing because the government's good cause for not producing the BOP employee in person—his out-of-state status—outweighs the defendant's interest, considering the reliability of the procedures proposed by the government (allowing cross examination, swearing in the witness, etc.)).

For example, "video-conferencing, if available, would allow a remote witness to testify and face cross-examination with minimal inconvenience and expense." United States v. Jordan, 742 F.3d at 278. And when such inexpensive means of communication are available, the court observed that a remote witness should generally be expected to appear by that means. Id.; see also United States v. Wallace, 557 F. App'x 567, 569 (7th Cir. 2014). In United States v. Jordan, the court permitted the officer who arrested the defendant and wrote the police report, to testify via two-way video conference, because it allowed a distant

witness to testify and face cross-examination with minimal inconvenience and expense. 765 F.3d 785, 787 (7th Cir. 2014).

Allowing Probation Officer Jones to appear via video conference is in the best interests of justice. According to the government, Probation Officer Jones was Mr. Smith's probation officer until Probation Officer Jones transferred to the probation office in the Western District of Missouri in Kansas City, Missouri where he currently lives and works. Probation Officer Jones is expected to testify about the alleged violations by Mr. Smith during his time as Mr. Smith's probation officer. During the revocation hearing, the court will place Probation Officer Jones under oath, the court and counsel will hear the government's questioning of Probation Officer Jones simultaneously, and Mr. Smith will be able to cross examine Probation Officer Jones.

Probation Officer Jones's out-of-state status and the probative value of his testimony weighed against the reliability of the procedure the court will follow to ensure Mr. Smith the opportunity to confront Probation Officer Jones, provides sufficient justification that allowing Probation Officer Jones to testify via video conference is in the best interests of justice. The court GRANTS the government's motion. [Doc. No. 192].

SO ORDERED.

ENTERED:   July 14, 2023   

_____/s/ Robert L. Miller, Jr._____
Judge, United States District Court

3

A3

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF INDIANA
2              SOUTH BEND DIVISION

3

4  UNITED STATES OF AMERICA    )
                               )    CAUSE NUMBER 3:10cr00107
5        vs                    )
                               )
6  JASON SMITH,                )
                               )    JULY 17, 2023
7          Defendant.          )

8

9

10             TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE ROBERT L. MILLER, JR.

11

12  APPEARANCES:

13

14  For the Government:    MR. LUKE N. REILANDER
                           Assistant United States Attorney
15                         204 South Main Street
                           South Bend, Indiana 46601
16

17  For the Defendant:     MR. DAVID VANDERCOY
                           Federal Public Defender
18                         130 South Main Street, Suite 300
                           South Bend, Indiana 46601
19

20

21

22

23

24        STENOGRAPHICALLY REPORTED, ECLIPSE SOFTWARE

25

1                              INDEX

2      GOVERNMENT'S WITNESS:
       ABRAM JONES
3      DIRECT EXAMINATION BY MR. REILANDER............PAGE  7
       VOIR DIRE EXAMINATION BY  MR. VANDERCOY........PAGE.29
4      DIRECT EXAMINATION (CON'D) BY MR. REILANDER....PAGE 30
       CROSS-EXAMINATION BY MR. VANDERCOY.............PAGE 35
5      REDIRECT EXAMINATION BY MR. REILANDER..........PAGE 37
       RYAN RUSH
6      DIRECT EXAMINATION BY MR. REILANDER............PAGE 39
       CROSS-EXAMINATION BY MR. VANDERCOY.............PAGE 46
7      ALEXANDER WILLIAMS
       DIRECT EXAMINATION BY MR. REILANDER............PAGE 51
8      CROSS-EXAMINATION BY MR. VANDERCOY.............PAGE 60
       GOVERNMENT RESTS...............................PAGE 62
9      DEFENDANT'S WITNESS:
       JASON SMITH
10     DIRECT EXAMINATION BY MR. VANDERCOY...........PAGE 63
       DEFENDANT RESTS................................PAGE 65
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Debra J. Bonk, Federal Certified Realtime Reporter*
*Debra_Bonk@innd.uscourts.gov / (574)246-8039*

A5

1        **THE COURT:**  Good morning.  This is Cause Number

2  3:10cr00107, **United States of America versus Jason Smith,** and

3  we are gathered for hearing on a petition to revoke supervised

4  release.

5        Mr. Vandercoy, we have several violations.  Does

6  Mr. Smith deny all, admit all, deny some, admit others?  Where

7  do we stand?

8        **MR. VANDERCOY:**  Mr. Smith admits several of the

9  marijuana violations.

10        On Page 2 of the amended petition for warrant,

11  Mr. Smith admits the violation on July 25th of 2022, which is

12  listed as Violation Number 2 under Mandatory Condition Number

13  2.

14        **THE COURT:**  Okay.

15        **MR. VANDERCOY:**  He also admits the violation on

16  December 5th, which is listed as Violation Number 4 on that

17  same page and under the same mandatory condition.

18        He denies the other violations.

19        **THE COURT:**  So the only admissions then relate to

20  those tests for marijuana, but all other alleged violations are

21  denied?

22        **MR. VANDERCOY:**  Yes.

23        **THE COURT:**  Okay.  Mr. Smith, I have to have you put

24  under oath for this question.  So if I could ask you to stand,

25  raise your right hand.  Thank you.

1           **THE DEFENDANT:** (Complies.)

2           **(Oath Administered.)**

3           **THE DEFENDANT:** Yeah.

4           **THE COURT:** You can be seated, sir.

5           **THE DEFENDANT:** (Complies.)

6           **THE COURT:** You are Jason Smith?

7           **THE DEFENDANT:** Yes, sir.

8           **THE COURT:** Mr. Smith, you got a copy -- or did you

9 get a copy of the summary report of violations?

10           **THE DEFENDANT:** Yes, sir.

11           **THE COURT:** And Mr. Vandercoy indicated -- there's

12 about thirteen of them here, and Mr. Vandercoy indicates that

13 you want to admit two of them, specifically that, on July 25 of

14 last year, you submitted a urine sample that tested positive

15 for marijuana, and you admitted using marijuana; and then the

16 same thing happened on December 5th of last year, that you

17 tested positive for marijuana, your urine did, and you admitted

18 using marijuana.

19           **THE DEFENDANT:** Any marijuana test I failed I admit

20 to. I don't know how many it is. I don't care.

21           **MR. VANDERCOY:** That's not quite correct, Your Honor.

22 He failed a test on June 22nd.

23           **THE COURT:** Right.

24           **MR. VANDERCOY:** But because marijuana shows up for an

25 extended period of time in tests, that doesn't establish that

1  he had used marijuana during the course of his supervision

2  which began six days before that test.

3         **THE COURT:**  Okay.

4         **THE DEFENDANT:**  All right.

5         **THE COURT:**  Okay.  Well, I will show the admissions

6  then to what's shown as Violation Number 2 and 4 of Mandatory

7  Condition Number 2 which relate to testing positive for

8  marijuana on June 25th and December 5th of last year.

9         And I understand that there will be at least one

10  witness, and this one is testifying remotely by video?

11        **MR. REILANDER:**  Yes.

12        Just to orient the Court, Your Honor, there are three

13  substantive Grade B violations in the first portion of this

14  amended petition.  The government will not be trying to

15  establish all three.  They involve three different offenses in

16  Ohio, Michigan, and Indiana.  The government will only be

17  seeking to establish the one offense here in Indiana.  So

18  related to that one offense and also to the other technical

19  violations, the government has one probation officer to be

20  testifying by video planned, and then the government also has

21  two South Bend Police Department officers in person in the

22  hallway ready to testify with regard to the Indiana state

23  violation.

24        **THE COURT:**  So you are proceeding, then, if I

25  understand it, with the events of May 18th of this year which

1   resulted in charges in the Saint Joseph Superior Court,

2   resisting law enforcement, a Level 6 Felony?

3            **MR. REILANDER:**  Correct, Your Honor.

4            **THE COURT:**  But not proceeding on events alleged to

5   have occurred in Ohio on February 25th of this year or in

6   Michigan on May 18th of this year?

7            **MR. REILANDER:**  Correct, Your Honor.

8            **THE COURT:**  And is the government proceeding on each

9   of the other alleged violations?

10           **THE DEFENDANT:**  Yes, Your Honor.  Although, now I

11  understand the defense's position on the first technical

12  violation, the June 22nd -- I believe, if I understand

13  defense's position -- is that he had not yet used marijuana by

14  the time he started supervised release.  And so to that point,

15  the government will concede that that was not a technical

16  violation either.

17           **THE COURT:**  So you withdraw that one?

18           **MR. REILANDER:**  Yes.

19           **THE COURT:**  But all the others you intend to prove?

20           **MR. REILANDER:**  Correct, Your Honor.

21           **THE COURT:**  Okay.  All right.  The government may

22  proceed.

23           **MR. REILANDER:**  May we have the first witness by

24  Zoom?

25           **MR. VANDERCOY:**  Judge, with regard to the witnesses

1    not here in person, we would object on Sixth Amendment grounds.

2    Because this is a criminal prosecution, part of a criminal

3    prosecution, we believe Mr. Smith has the right to confront his

4    accusers in open court live and face-to-face.  That is our

5    objection.

6             Thank you.

7             **THE COURT:**  Last week, knowing that from the

8    government's motion that the defendant objected, but there

9    wasn't enough time for the defense to get a written objection

10   on file.  But we tried to do some quick research, and I'm

11   comfortable with where that leads.  So I'll overrule the

12   defendant's objection for the reasons stated in last Friday's

13   granting of the motion.  I know it's an issue that has yet to

14   play out completely in the courts.

15            **MR. VANDERCOY:**  I understand, Your Honor.  Thank you.

16            **COURTROOM DEPUTY:**  Judge, do you want me to swear in

17   the witness now?

18            **THE COURT:**  Yes, please.

19                         **ABRAM JONES,**

20   **Government's witness, sworn, examined, testified as follows:**

21                      **DIRECT EXAMINATION**

22   **BY MR. REILANDER:**

23   **Q.**   Can you please state and spell your name for the record?

24   **A.**   Yes.  First name is Abram, A-B-R-A-M.  Last name Jones,

25   J-O-N-E-S.

1  **Q.**  And what do you do for a living?

2  **A.**  I'm a United States probation officer.

3  **Q.**  How long have you been with the Probation Office?

4  **A.**  I've been with the United States Probation Office for

5  about one-and-a-half years.

6  **Q.**  And what do you do right now?  Where are you located?

7  **A.**  Currently, I'm a U.S. probation officer assigned to the

8  Western District of Missouri, Kansas City office.  I'm a

9  supervision officer in that division.

10  **Q.**  How long have you been there?

11  **A.**  I've been in this office for approximately three months.

12  **Q.**  And before that time period, did you act as a probation

13  officer in a different office?

14  **A.**  Yes.  Prior to this position in the Western District of

15  Missouri, I was a supervision officer in the Northern District

16  of Indiana, South Bend office, for over one year.

17  **Q.**  And when you were a probation officer here in South Bend,

18  did you know an individual named Jason Lamont Smith?

19  **A.**  I do.

20  **Q.**  In what capacity did you know that individual?

21  **A.**  I supervised Mr. Smith from the beginning of his term of

22  supervised release to when I left the office around mid-April.

23  **Q.**  Now, prior to this hearing, I presented to you six

24  different exhibits; is that correct?

25  **A.**  Yes, sir.

1    Q.   Do you have those exhibits with you there?

2    A.   I do.

3         **MR. REILANDER:**  Your Honor, I've already provided

4    these exhibits to defense counsel.

5    Q.   I'm going to show Exhibit 6.  I'll refer to Exhibit 6.

6         Can you identify what Exhibit 6 is?

7    A.   Yes.  Exhibit 6 is a judgment and commitment order -- in

8    this case, an amended judgment and commitment order -- for

9    Jason Smith detailing his convictions, counts of conviction,

10   outlining his period of incarceration, and his period of

11   supervised release, as well as the conditions of said

12   supervised release.

13   Q.   So this document, is that something that you -- it comes

14   from his criminal case, but it's something that you use as part

15   of your supervision?

16   A.   That's correct.  It's the cornerstone of our supervision.

17   Q.   Now, the first page of this has a case caption.  Do you

18   see that?

19   A.   Can you repeat that, please?

20   Q.   I just want to refer to the case number.

21        Do you see the case number at the top?

22   A.   Yes, I do.

23   Q.   And what is the case number here?

24   A.   It is 3:10cr00107.

25   Q.   And is this for Jason Smith?

1  **A.**   This is.

2  **Q.**   And the individual identified in this particular case,

3  criminal case, is that the person you were supervising?

4  **A.**   It was, yes.

5  **Q.**   Now, this first page says, "Amended Judgment."  Do you see

6  that?

7  **A.**   Yes.

8  **Q.**   On the first page, it has three crimes that are identified

9  as being the ones that the defendant, Jason Smith, was found

10  guilty on.  Do you see that?

11  **A.**   I do.

12  **Q.**   What are those three crimes?

13  **A.**   Count 1 is possession with intent to distribute cocaine

14  base (crack), Count 3 is felon in possession of a firearm,

15  Count 4 is possession of a firearm in furtherance of a

16  drug-trafficking crime with forfeiture allegation.

17  **Q.**   Did Mr. Smith serve time in Bureau of Prisons

18  incarceration following these convictions?

19  **A.**   He did, yes.

20  **Q.**   And then following his time in the Bureau of Prisons, was

21  he released and then start time as a federal defendant on

22  supervised release?

23  **A.**   Not necessarily.

24       Following his release from the Bureau of Prisons, he

25  served time remaining in the Indiana Department of Corrections.

1   **Q.**   So he first served time with the Indiana Department of

2   Corrections; is that right?

3   **A.**   He served with the Bureau of Prisons, then the Indiana

4   Department of Corrections.  He was released from the Indiana

5   Department of Corrections to begin his supervised release.

6   **Q.**   And then what happened at that point?

7   **A.**   Once he was released from the Indiana Department of

8   Corrections, I was following his case prior to his release.

9   Upon his release, I made contact with Mr. Smith.  And

10  subsequent to that, we met in the office to go over his

11  conditions of supervised release now that he was released to

12  the community.

13  **Q.**   When did you meet with Mr. Smith?

14  **A.**   That would have been on June 22nd of 2023 -- or 2022.

15  My apologies.

16  **Q.**   Okay.  I want you to turn to Page 4 of Exhibit 6.

17  **A.**   (Complies.)

18  **Q.**   On Page 4, it says "Supervised Release" at the top.  Do

19  you see that?

20  **A.**   I do.

21  **Q.**   What is on Page 4?

22  **A.**   So Page 4 details the period of supervised release that a

23  defendant would serve after a period of incarceration, details

24  the period of time, as well as the conditions that they are

25  required to follow by the Court.

1   Q.   And then turning to the last page of the document, Page 7

2   entitled "Acknowledgment of Supervision Conditions," what is

3   Page 7?

4   A.   Page 7 is a written acknowledgment that the conditions of

5   supervision, upon an individual's release, have been gone over

6   with that individual, typically read verbatim to that

7   individual.  It details the possible penalties of violations of

8   supervised release and provided them with an opportunity to

9   sign their acknowledgment of understanding.

10   Q.   Now, I see, at the bottom of the page, there are two

11   signature lines.  Do you see that?

12   A.   I do.

13   Q.   Do you recognize the signature lines?

14   A.   I do.

15   Q.   And what are they?

16   A.   The signature lines -- there are two, one for the

17   defendant and one for the witness or assigned probation officer

18   at the time of the viewing of the conditions.

19   Q.   I'm sorry.  Are there signatures there?

20   A.   Yes, there are two signatures.

21   Q.   Whose signatures are they?

22   A.   There is one at the top for Jason Smith dated

23   June 22nd of 2022, and the second one is the signature for

24   myself dated June 22nd of 2022.

25   Q.   You mentioned that you met with Mr. Smith on June 2nd,

 1  2022, for the first time; is that right?

 2  **A.**   June 22nd.

 3  **Q.**   June 22nd?

 4  **A.**   Yes.  That was the first time we had met in person.

 5  **Q.**   And when you met in person, is this the page that you

 6  would have signed during that meeting?

 7  **A.**   This is, yes.

 8       **MR. REILANDER:**  Your Honor, the government offers

 9  Exhibit 6 into evidence.

10       **THE COURT:**  Any objection to Government's 6?

11       **MR. VANDERCOY:**  No, Your Honor.

12       **THE COURT:**  Government's Exhibit 6 is admitted

13  without objection.

14  **BY MR. REILANDER:**

15  **Q.**   So when you met Mr. Smith at the first time on

16  June 22nd, 2022, did you review the conditions of supervised

17  release starting on Page 4 with Mr. Smith?

18  **A.**   I did.

19  **Q.**   And after you reviewed those conditions, did you then sign

20  the last page with Mr. Smith where he acknowledges those

21  conditions?

22  **A.**   Yes.

23       **MR. REILANDER:**  I just would like to focus on a few

24  of the conditions for the record, Your Honor.

25  **Q.**   So, Mr. Jones, turning back to Page 4, towards the top of

1    the page, the first condition of supervised release reads, "The

2    defendant shall not commit another federal, state, or local

3    crime."

4            Do you see that?

5    **A.**    I do.

6    **Q.**    Is that a condition that Mr. Smith had as part of his

7    supervised release?

8    **A.**    It was, yes.

9    **Q.**    And did he acknowledge that condition?

10   **A.**    He did.

11   **Q.**    Further down on the page, Number 2, the Number 2 condition

12   reads -- and you can follow along with me, Mr. Jones, there --

13   "The defendant shall not unlawfully possess a controlled

14   substance.  The defendant shall refrain from any unlawful use

15   of controlled substance.  The defendant shall submit to one

16   drug test within fifteen days of release from  imprisonment and

17   at least two periodic drug tests thereafter as determined by

18   the Court."

19           Do you see that condition?

20   **A.**    I do.

21   **Q.**    Is that a condition you reviewed with Mr. Smith?

22   **A.**    It is.

23   **Q.**    And did he acknowledge that condition before signing the

24   acknowledgment sheet?

25   **A.**    He did.

1    **Q.**   Then further down at the bottom of page, there's a

2    Condition 11 that reads, "The defendant shall notify the

3    probation officer within 72 hours of being arrested or

4    questioned by a law enforcement officer."

5          Do you see that condition?

6    **A.**   I do.

7    **Q.**   Was that condition advised to Mr. Smith?

8    **A.**   It was.

9    **Q.**   And would he have acknowledged that condition as part of

10   the acknowledgment signature?

11   **A.**   Yes.

12   **Q.**   Now, on the day that you met Mr. Smith, did you give

13   Mr. Smith a drug test?

14   **A.**   Yes.

15   **Q.**   And what happened during that drug test?

16   **A.**   Prior to that discussion, Mr. Smith admitted that he may

17   test positive for marijuana.  We subsequently did an instant

18   drug test to get the scope of the situation, and that drug test

19   tested positive for marijuana.

20   **Q.**   I'm going to show you what's been marked Government's

21   Exhibit Number 1.

22          And what is Exhibit Number 1?

23   **A.**   Exhibit Number 1 is a drug test report.

24          Following the drug test result, we sent the sample to

25   the lab to get further analysis of the --

1        MR. VANDERCOY:  We'll object to any testimony from

2  this witness regarding a drug test report until there's a

3  foundation laid with regard to chain of custody.

4        THE COURT:  Do you wish to respond or adapt your

5  questions?

6        MR. REILANDER:  Well, Your Honor, we do not have the

7  drug testing here to present in court today.  I think, based on

8  the different evidentiary levels here for a hearing of this

9  matter, we can still present this report as a report that the

10  Probation Office did receive from the lab indicating that there

11  was a positive drug test.

12        THE COURT:  It sounds like you're offering it for a

13  limited purpose.  And I may be misunderstanding.  But if it is

14  for a limited purpose, what is the limited purpose?

15        MR. REILANDER:  It's simply that -- well, this is not

16  -- it's just to show that he tested positive for marijuana that

17  very day, Your Honor.

18        THE COURT:  So how would that be limited, as opposed

19  to if you did have the chain of custody and put that in?  It

20  would show that he tested positive for marijuana, as well.  I'm

21  trying to figure out -- I may be mistaken, what you're doing,

22  but it sounds like you are offering it for a purpose more

23  limited than if you had the chemist or whoever conducted the

24  test here.  And if that's true, I'm trying to figure out, I

25  guess, what purpose is it not being offered for.

1          **MR. REILANDER:**  I'm not sure that I'm understanding.

2   I'm sorry, Your Honor.

3          **THE COURT:**  I'm sorry?

4          **MR. REILANDER:**  I'm not sure that I'm understanding.

5   I'm sorry, Your Honor.

6          **THE COURT:**  Yeah, I didn't ask the question very

7   well.

8          It sounds to me as though -- because you started out

9   by saying you don't have the chemist here, or whoever

10  conducted -- the assayer, I guess, as it would have been years

11  ago.

12         So you're offering it only to show that the probation

13  officer was told that he tested positive?

14         **MR. REILANDER:**  No.  I'm offering it to say that this

15  lab report does say that it tests positive for marijuana.

16         I think, in a hearing like this, there's sufficient

17  indicia of reliability that this lab test -- even though we do

18  not have the lab tester here in person to testify, there's

19  sufficient indicia of reliability that that's still a reliable

20  test confirming that it was a positive test.

21         **THE COURT:**  So you're not offering it for any limited

22  purpose; you're offering it for what you would ordinarily offer

23  it for?

24         **MR. REILANDER:**  Yes, Your Honor.  Yeah.

25         **THE COURT:**  Mr. Vandercoy, do you wish to be heard

1  further on your objection?

2          **MR. VANDERCOY:**  Yes, Judge.

3          Judge, there's no indication that the sample taken

4  from Mr. Smith is, in fact, the sample tested, absent a showing

5  of a chain of custody.

6          Moreover, with regard to the drug test report, if

7  it's being offered to show that he failed that test, then

8  there's also a failure of the government to show that there

9  were any reliable principles applied here, as required under

10  702, or that reliable principles exist to show that we have a

11  good result, or that they were applied in any reasonable

12  fashion.

13          And, also, we have a confrontation violation if the

14  government is attempting to submit this report in lieu of the

15  expert personally appearing.

16          Thank you.

17          **THE COURT:**  Thank you, sir.

18          The rules of evidence don't apply in a revocation

19  hearing, but the constitutional principles do to a lesser

20  extent than they would at trial with due process and

21  confrontation.

22          I think I am permitted to infer that the drug test

23  was done pursuant to a contract with the Probation Office and

24  that I think that then allows an inference that it was done

25  consistent with reasonable scientific principles and methods,

1    and I think that it would be admissible -- rule that it is

2    admissible at a revocation hearing, recognizing that the lab

3    report is present.  We're not just having the probation officer

4    testify to what he was told, so there is a little more of a

5    step toward what confrontation would ordinarily look like.

6            Am I right, though; this is the one you're not

7    proceeding on?

8            **MR. REILANDER:**  Correct, Your Honor.

9            **THE COURT:**  Okay.  This is going to get interesting

10   when we get to the ones you are proceeding on.

11           The objection to Exhibit 1 is overruled.

12   BY MR. REILANDER:

13   Q.   Mr. Jones, this Exhibit 1 has two other pages to it.

14           The second page, can you just describe what that page

15   is?

16   A.   Yes.  So the second page is an admission or a denial

17   report.

18           When the Probation Office in Indiana had people

19   submit to drug tests after getting a positive result for any

20   drug, we would have the person fill this out, indicating

21   whether they admit or deny to using the drug that appeared on

22   the drug test.

23   Q.   And on that page -- did you sign that page?

24   A.   I did.

25   Q.   And Mr. Smith, did he sign that page?

1    **A.**    He did.

2    **Q.**    And in signing, did he admit that he had used a controlled

3    substance?

4    **A.**    He did.

5    **Q.**    This exhibit has one final page, a third page.  Can you

6    describe what that page is?

7    **A.**    Yes.  So this is -- this third page is the chain of

8    custody form that is filled out prior to -- and sent along with

9    a drug test that is sent to the lab for analysis.

10   **Q.**    And on that page, are there signatures?

11   **A.**    There are.

12   **Q.**    Did you sign this page?

13   **A.**    I did.

14   **Q.**    And did Mr. Smith also sign this page?

15   **A.**    He did.

16           **MR. REILANDER:**  Your Honor, I don't think I've

17   offered this exhibit yet, so I offer this exhibit evidence.

18           **THE COURT:**  I think I jumped ahead.

19           Any further objection, Mr. Vandercoy?

20           **MR. VANDERCOY:**  No, Your Honor, nothing further.

21           **THE COURT:**  As stated a little prematurely,

22   Government's Exhibit 1 is admitted over the defendant's

23   objection.

24   **BY MR. REILANDER:**

25   **Q.**    Now, following your conversation with Mr. Smith on

1  June 22nd when you understood from him that he had taken

2  marijuana in the past, did that prompt you to make an

3  additional condition to be added to his supervision?

4  **A.**    Yes.

5  **Q.**    Can you just describe what happened?

6  **A.**    So on our discussion of Mr. Smith's drug test positive, as

7  well as his drug history prior to his release, and looking at

8  his conditions which did not have a condition at the time for

9  substance abuse treatment, discussion was had about adding that

10 condition.  At which point, Mr. Smith was presented with a

11 waiver to add that condition to his conditions of supervision

12 release and additional approval, of course.

13 **Q.**    Sorry to interrupt.

14 **A.**    Go ahead.

15 **Q.**    I just want to read the condition just to confirm this is

16 the condition we're talking about, okay, into the record.

17        The condition would read, "Unless an assessment at

18 the time of release from imprisonment or commencement of

19 probation indicates participation would be unnecessary, the

20 defendant shall participate in a substance abuse treatment

21 program or after-care program."

22        Is that the condition that you're referring to?

23 **A.**    It is, with additional verbiage, as well.  But, yes.

24 **Q.**    So that condition is an additional one that you suggested

25 following your conversation with Mr. Smith; is that right?

1   **A.**    Yes.

2   **Q.**    And did Mr. Smith agree to that condition?

3   **A.**    He did.

4   **Q.**    Did that condition eventually get submitted to the Court

5   and get added to the court order?

6   **A.**    Yes.

7   **Q.**    Based on that condition, did you then schedule Mr. Smith

8   for substance abuse treatment programs?

9   **A.**    I did.

10  **Q.**    All right.  I want to turn to Exhibit 2.

11            Do you recognize Exhibit 2?  Sorry.  Do you recognize

12  Exhibit 2?

13  **A.**    I do, yes.

14  **Q.**    Is Exhibit 2 similar to Exhibit 1 in that it's got three

15  pages involving the lab drug test report, an admission sheet,

16  and the chain of custody page related to another positive drug

17  test?

18  **A.**    Yes.

19  **Q.**    But this drug test is the one involving a meeting with

20  Mr. Smith on July 25, 2022?

21  **A.**    Yes.

22  **Q.**    Did you meet with Mr. Smith on July 25, 2022?

23  **A.**    Yes.

24  **Q.**    At that meeting, did he take another drug test?

25  **A.**    Yes.

1   **Q.**    Was it positive when he took it?

2   **A.**    Yes, it was.

3   **Q.**    And then did you take that sample and submit it to the

4   lab?

5   **A.**    Yes.

6   **Q.**    Did you submit it with that third page, the

7   chain-of-custody page?

8   **A.**    That's correct, yes.

9   **Q.**    And later on, did you get back from the lab the first page

10  which is the drug test report?

11  **A.**    Yes.

12  **Q.**    And at that same meeting, before you got it back from the

13  lab on July 25, 2022 when you were with Mr. Smith, did he sign

14  this admission sheet admitting that he had used marijuana?

15  **A.**    Yes.

16         **MR. REILANDER:**  Your Honor, I offer Exhibit 2 into

17  evidence.

18         **THE COURT:**  Any objection to Exhibit 2?

19         **MR. VANDERCOY:**  Judge, we object to portions of it.

20  We object to the drug test report on confrontation grounds and

21  also the failure to meet 702.  There's no basis to conclude

22  that reliable principles supported this drug test, nor that

23  those reliable principles were applied in a reasonable fashion.

24  We also object to the lack of any chain of custody.

25         That's the extent of our objection.  Thank you.

1        **THE COURT:**  So you're not objecting to any statements

2   by Mr. Smith in there?

3        **MR. VANDERCOY:**  No.  That's correct.  We stipulate

4   that he admitted he used marijuana.

5        **THE COURT:**  On the same grounds as I ruled on the

6   objection to Government's Exhibit 1, I will overrule the

7   defendant's limited objection to Government's 2, and it is

8   admitted into evidence.

9   BY MR. REILANDER:

10  Q.   I want to turn, again, now to Government's Exhibit 3.

11       Now, did you, Mr. Jones, meet with Mr. Smith on

12  November 4, 2022?

13  A.   Yes.

14  Q.   And on that date, did he, again, take a drug test?

15  A.   Yes.

16  Q.   Did he test positive on the drug test?

17  A.   He did, yes.

18  Q.   Did you submit that drug sample -- sorry -- that urine

19  sample to the lab with a chain-of-custody page?

20  A.   Yes.

21  Q.   And, then, later on, did you receive back from the lab a

22  lab test indicating a positive marijuana test?

23  A.   Yes.

24  Q.   On that same day that you met with Mr. Smith, on

25  November 4, 2022, did he admit that he had taken marijuana?

1    **A.**    At this time, Mr. Smith denied any marijuana use.

2    **Q.**    Now, Exhibit 4, similar to the -- I'm sorry.

3          Exhibit 3, similar to the previous Exhibit 1,

4    Exhibit 2, is it a three-page exhibit containing the drug test

5    report, the second page being the denial sheet that Mr. Smith

6    signed, and then the chain-of-custody sheet?

7    **A.**    Yes, that's correct.

8    **Q.**    So the second page -- look at that, briefly -- that's

9    similar to the second page in the other two exhibits where a

10   defendant would -- the previous ones, Mr. Smith had checked the

11   box saying "admission," correct?

12   **A.**    That's correct.

13   **Q.**    On this page, what does the sheet say?

14   **A.**    The sheet indicates a checked box under the "I deny

15   illegal use of prohibited controlled substance" box.

16          **MR. REILANDER:**  Your Honor, the government offers

17   Exhibit 3 into evidence.

18          **THE COURT:**  I'm sorry.  I couldn't -- oh, offers

19   Exhibit 3.

20          I assume the same objection, Mr. Vandercoy?

21          **MR. VANDERCOY:**  Yes, Your Honor, all the same

22   objections.

23          **THE COURT:**  Okay.  And on the same grounds, the

24   objection to Exhibit 3 is overruled, and Exhibit 3 is admitted

25   into evidence.

1   **BY MR. REILANDER:**

2   **Q.**    Turn to Exhibit 4.  Exhibit 4 is just a single page,

3   Mr. Jones.

4             Do you see that?

5   **A.**    I do.

6   **Q.**    Now, did you meet with Mr. Smith on December 5, 2022?

7   **A.**    Yes, I did.

8   **Q.**    And on that date, did you do a drug test with him?

9   **A.**    I did.

10  **Q.**    Did it come back positive?

11  **A.**    It did.

12  **Q.**    Did Mr. Smith admit to the use of marijuana on that date?

13  **A.**    He did, yes.

14  **Q.**    Exhibit 4 is just a single sheet.  It appears to be the

15  admissions sheet.

16            Do you see that?

17  **A.**    Yes.

18  **Q.**    On that sheet, what does it indicate?

19  **A.**    This sheet indicates a checked box under the "I admit to

20  illegal use of a prohibited controlled substance."

21  **Q.**    And did Mr. Smith sign that sheet?

22  **A.**    He did.

23  **Q.**    Did you send that sample off to the lab on that particular

24  day?

25  **A.**    This sample was not sent to the lab.

1  **Q.**   And why is that?

2  **A.**   My best recollection is this was around the time a

3  department policy change occurred whereby positive drug tests

4  for marijuana, followed by a written admission, were not sent

5  to the lab.

6            **MR. REILANDER:**  Your Honor, the government offers

7  Exhibit 4 into evidence.

8            **THE COURT:**  Any objection --

9            **MR. VANDERCOY:**  No, Your Honor.

10           **THE COURT:**  -- to Exhibit 4?

11           **MR. VANDERCOY:**  No objection to Exhibit 4.

12           **THE COURT:**  Without objection, Government's Exhibit 4

13 is admitted into evidence.

14 **BY MR. REILANDER:**

15 **Q.**   Now, during this Fall period when you were supervising

16 him, had you recommended that he attend a drug treatment

17 program?

18 **A.**   I recommended that he obtain an assessment from a

19 certified provider.

20 **Q.**   Did he attend any sessions during the Fall of 2002 (sic)?

21 **A.**   He attended two sessions.

22 **Q.**   Do you know what sessions those were?

23 **A.**   May I refer to the exhibits to refresh my memory on the

24 dates?

25 **Q.**   Are you talking about Exhibit 5?

1  A.   Yes.

2  Q.   Describe what Exhibit 5 is.

3  A.   Exhibit 5 is a monthly treatment report that our contract

4  providers give to the Probation Office to indicate a person who

5  we've sent to them for substance abuse treatment, indicate

6  their participation.

7  Q.   Now, this particular Exhibit 5 has the name "Victory

8  Clinic" at the top?

9  A.   That's correct.

10 Q.   What is Victory Clinic?

11 A.   Victory Clinical Services is a substance abuse treatment

12 provider in the Northern District of Indiana, primarily the

13 South Bend area.

14 Q.   And is that the clinic that Mr. Smith was supposed to

15 report to through the Fall months of 2002 (sic)?

16 A.   Yes, that's correct.

17 Q.   This treatment report is something you get back from

18 clinic to detail his participation?

19 A.   Yes.

20      MR. REILANDER:  Your Honor, the government offers

21 Exhibit 5 into evidence.

22      MR. VANDERCOY:  Judge, could I ask several questions

23 for purposes of formulating an objection?

24      THE COURT:  You may.

25

1                     VOIR DIRE EXAMINATION

2    BY MR. VANDERCOY:

3    Q.   Sir, do you have any firsthand knowledge with regard to

4    whether or not Mr. Smith attended treatment at Victory Clinic?

5    A.   Firsthand as in seeing him --

6    Q.   Were you present there to determine whether he --

7    A.   No.

8    Q.   Okay.  You were not present?

9    A.   No, I was not.

10   Q.   So you're relying entirely on this document to determine

11   whether or not he did attend or did not attend; is that

12   correct?

13   A.   That's correct.

14   Q.   Do you know the person who created the document?

15   A.   Yes.  The counselor in question, Ricardo Lottie, was a

16   counselor with Victory Clinic, and I knew him during my time

17   there.

18            MR. VANDERCOY:  Thank you.

19            Judge, we'll object on the grounds that it's not

20   properly authenticated.  And the witness cannot testify as to

21   whether or not Mr. Smith attended or did not attend.  So it's

22   not only no ability to authenticate it, but there's no showing

23   made by the government with regard to reliability, and so we'll

24   object on this ground, as well as confrontation and hearsay.

25            Thank you.

1              **THE COURT:**  Thank you, sir.

2              Do you wish to respond?

3              **MR. REILANDER:**  Can I ask a few more questions of the

4     witness, Your Honor?

5              **THE COURT:**  Sure.

6                   **DIRECT EXAMINATION (CONTINUED)**

7     BY MR. REILANDER:

8     **Q.**   This particular document, Mr. Jones, how did you get this

9     particular document?

10    **A.**   This document was faxed to our office directly from

11    Victory Clinic.

12    **Q.**   Beyond the facts in this document, did you have

13    communications with the clinic with regard to Mr. Smith's

14    participation in programs there?

15    **A.**   I did, yes.

16    **Q.**   Can you describe that for the Court?

17    **A.**   So, periodically, I would reach out to providers -- in

18    this case, Victory Clinic -- to verify an individual's

19    participation.  In the case of Mr. Smith, I recall speaking

20    with Victory Clinic and confirming that he was not attending

21    sessions on a weekly basis as they had recommended and that

22    they had concerns about his attendance.

23    **Q.**   Are these conversations over the phone with Victory

24    Clinic?

25    **A.**   By phone, yes.

1   **Q.**   And you mentioned that you know the individual at the

2   bottom of this sheet who signed this, the counselor.

3           Do you see that?

4   **A.**   Yes, I do.  Mr. Lottie.

5   **Q.**   Did you interact with Mr. Lottie in other cases, as well?

6   **A.**   I did, yes.

7   **Q.**   And would Mr. Lottie report to you as to what Mr. Smith or

8   other defendants were doing at the Victory Clinic?

9   **A.**   He would, yes.

10          **MR. REILANDER:**  Your Honor, the government submits

11  that there's sufficient indicia of reliability with regard to

12  this document.

13          **THE COURT:**  Help me with the confrontation clause

14  objection.  Let me tell you why I'm looking for help.

15          My understanding of the current state of the law when

16  it comes to confrontation during a supervised release

17  revocation hearing is that the right of confrontation does not

18  quite mean in a revocation setting what it means at trial, but

19  there is still some balancing that has to be done to determine

20  the reason why the face-to-face confrontation doesn't occur and

21  balance that against the injury to the defendant with the loss

22  of direct confrontation.

23          I think it's one thing when we're talking about Zoom.

24  And I think the Courts have recognized that chemists are hard

25  to come by and so we don't haul them out for everything.  But

1    if this person is local, I guess help me understand the

2    inconvenience or difficulty to the government of presenting a

3    live witness.

4         **MR. REILANDER:**  Just a balancing of factors, Your

5    Honor, in terms of use of the government's time and resources,

6    but I acknowledge the Court's position.

7         **THE COURT:**  I'm going to sustain the objection.

8    **BY MR. REILANDER:**

9    **Q.**   Following Victory Clinic, did you refer Mr. Smith to the

10   ARC Program?

11   **A.**   Yes.

12   **Q.**   Was an appointment with ARC scheduled for November 25,

13   2022?

14   **A.**   It was, yes.

15   **Q.**   Did Mr. Smith attend that appointment?

16        **MR. VANDERCOY:**  Objection, Your Honor.

17   **A.**   He did.

18        **MR. VANDERCOY:**  Until there's a showing of firsthand

19   knowledge by the witness, we'll object to it.

20        **THE COURT:**  I'll allow the answer.  You can go back

21   in and move to strike.  But just to keep us moving along.

22        I didn't hear the answer, though.

23   **BY MR. REILANDER:**

24   **Q.**   Did he attend the appointment on November 25, 2022?

25   **A.**   He did not.

1    **Q.**    How do you know that?

2    **A.**    I received a phone call from Addictions Recovery Center,

3    ARC counselor, that indicated that Mr. Smith did not report for

4    his assessment.

5          **MR. VANDERCOY:**  Judge, my objection is the same as to

6    the prior objection.  There's no firsthand knowledge on the

7    part of this witness.  There's a confrontation violation.  And

8    there's no showing of reliability with regard to the witness's

9    assertions on behalf of another person.

10         Thank you.

11         **THE COURT:**  Thank you, Mr. Vandercoy.

12         Do you wish to be heard, Mr. Reilander?

13         **MR. REILANDER:**  That's all the evidence that we have,

14   Your Honor, on this point.

15         **THE COURT:**  The objection is sustained to that

16   testimony about reporting to Addictions Recovery Center on

17   January 12.

18         Is that the date you were talking about?

19         No.  Yeah.

20         **MR. REILANDER:**  November 25.

21         **THE COURT:**  November 25.

22         **MR. REILANDER:**  All right.  Your Honor, I will, in

23   the interest of time, then, skip over the other violations

24   related to the ARC attendance.

25   **Q.**    Mr. Jones, I want to turn your attention to February 23,

1    2023.

2              Was that a date when you had directed Mr. Smith to

3    report to the Probation Office to submit to random drug tests?

4    **A.**   It was, yes.

5    **Q.**   Did Mr. Smith come to the office for that drug test?

6    **A.**   He did not.

7    **Q.**   Finally, on February 25, 2023, did you get a phone call in

8    the middle of the night?

9    **A.**   I did, yes.

10   **Q.**   Just what happened at that time?

11   **A.**   So I received a phone call from a sheriff with Dare County

12   in Ohio indicating that they had contact with Mr. Smith during

13   a vehicular pursuit.

14   **Q.**   You don't need to get into the phone details of that phone

15   call.

16             I want to ask you, though.  Following that phone

17   call, did Mr. Smith inform you that he had had contact with a

18   police officer?

19   **A.**   He did not.

20   **Q.**   Now, did you -- when did you leave the South Bend office?

21   **A.**   I left the South Bend office in mid-April of 2023.

22   **Q.**   Before that time, did you initiate the petition for

23   warrant in this case?

24   **A.**   I did.

25             **MR. REILANDER:**  That's all, Your Honor.

1          THE COURT:  Thank you, Mr. Reilander.

2          Any Cross, Mr. Vandercoy?

3          MR. VANDERCOY:  Yes, Your Honor.

4          Judge, do you want me to use the lectern?  I want to

5   sit here so the witness can see me.  Do you want me to use the

6   lectern?

7          THE COURT:  Is the lectern usable?

8          COURTROOM DEPUTY:  (Nods head.)

9          THE COURT:  Yeah, that's fine.

10          MR. VANDERCOY:  Thank you.

11                      CROSS-EXAMINATION

12   BY MR. VANDERCOY:

13   Q.   With regard to the phone call that you indicated you

14   received in the middle of the night, did you indicate that was

15   the phone call from Ohio officers?

16   A.   Yes.

17   Q.   Okay.  Thank you.

18          Do you know the date that Mr. Smith was released from

19   the Indiana Department of Corrections?

20   A.   That would have been June 16th of 2022.

21   Q.   June 16th.

22          And in your training as a probation officer, have you

23   learned that marijuana will show up in different tests for a

24   significant period of time after the use of marijuana?

25   A.   Yes.

1   Q.   And have you been advised as to any particular length of

2   time or time span that that testing will show up?

3   A.   So this is based on my firsthand knowledge as a probation

4   officer, not as a person who processes these drug tests.

5   However, my training has indicated that, depending on the use

6   of marijuana, per person, it could vary between 30 to 45 days.

7   Q.   Okay.  So the test that you administered on June 22nd,

8   would you agree that it's entirely possible that Mr. Smith's

9   use of marijuana that resulted in a positive test result on

10  June 22nd could have been -- it could have been marijuana use

11  prior to the 7 that he went on federal supervision?

12  A.   It is possible.

13  Q.   Thank you.

14          When was Mr. Smith released from prison, from the

15  Bureau of Prisons?

16  A.   I don't recall.

17  Q.   Do you know whether he was afforded any opportunity to

18  work in a halfway house to earn income and address society

19  after his release from the Bureau of Prisons?

20  A.   I don't recall, but I do not believe so considering he had

21  a period of incarceration in state custody afterward which

22  would not allow him the opportunity.

23  Q.   Okay.  So your recollection is that he went straight from

24  federal custody into state custody, full custody, and then was

25  released from that state custody on June 16th of 2022?

1   A.    Yes, that's my recollection.

2   Q.    Okay.  So do you find that time in a halfway house is

3   beneficial to a prisoner in terms of their readjustment to

4   society and complying with the terms of supervision?

5   A.    I believe it is beneficial.

6   Q.    I'm sorry.  Can you say that again?  I didn't hear you.

7   A.    I believe it is beneficial.

8   Q.    I don't hear very well.  I apologize.

9         After you applied for a warrant, how long after that

10  application to the Court did you leave the Probation Office

11  here in the Northern District of Indiana?

12  A.    I believe it was a month, perhaps a bit more.

13  Q.    Were you advised as to whether Mr. Smith had called in to

14  speak with you about whether a warrant existed?

15  A.    No, I was not.

16          **MR. VANDERCOY:**  Could I have a moment, Judge?

17          **THE COURT:**  Sure.

18          **(Discussion held out of stenographer's hearing.)**

19          **MR. VANDERCOY:**  I have nothing further, Your Honor.

20          **THE COURT:**  Thank you, Mr. Vandercoy.

21          Any redirect, Mr. Reilander?

22          **MR. REILANDER:**  Just, briefly.

23                          **REDIRECT EXAMINATION**

24  BY MR. REILANDER:

25  Q.    Mr. Jones, when Mr. Smith started his supervised release

1  in June of 2022, what was the length of 7 of the supervised

2  release for?

3  **A.**   Mr. Smith was ordered to serve three years.

4  **Q.**   Pardon me?

5  **A.**   His length of supervised release was three years.

6  **Q.**   So approximately June of 2025 then?

7  **A.**   There around, yes.

8          **MR. REILANDER:**  That's all, Your Honor.

9          **THE COURT:**  Thank you, sir.

10         Any Recross?

11         **MR. VANDERCOY:**  No, Your Honor.

12         **THE COURT:**  I would tell Mr. Jones he can step down,

13  but I'm not sure we're doing that electronically.

14         Should we cancel the connection here?

15         Thank you, Mr. Jones, for your testimony.

16         **THE WITNESS:**  Thank you.

17         **(Witness excused.)**

18         **MR. REILANDER:**  May I call the next witness?

19         **THE COURT:**  You may.

20         **(Witness approaches.)**

21         **THE COURT:**  If you would raise your right hand before

22  you're seated here, please.  Face this lady over here.

23         **THE WITNESS:**  (Complies.)

24         **(Oath Administered.)**

25         **THE WITNESS:**  I do.

1                          RYAN RUSH,

2    Government's witness, sworn, examined, testified as follows:

3                        DIRECT EXAMINATION

4    BY MR. REILANDER:

5    Q.    Can you state and spell your name for the record?

6    A.    R-Y-A-N R-U-S-H.   Ryan Rush.

7    Q.    Officer Rush?

8    A.    Yes, sir.

9    Q.    What do you do for a living?

10   A.    I work for the South Bend Police Department.

11   Q.    How long have you been doing that?

12   A.    Seven years.

13   Q.    And what are your duties in that capacity?

14   A.    I'm assigned to the Strategic Focus Unit as a narcotics

15   investigator.

16   Q.    I want to turn your attention to May 18, 2023.

17              What did you do that day?

18   A.    Me and my partner were assigned a plain-clothes

19   surveillance detail to help assist with the apprehension of a

20   wanted party.

21   Q.    Was there a federal agency that notified your office about

22   making this arrest?

23   A.    Yes, there was.

24   Q.    Which agency was that?

25   A.    U.S. Marshals.

1  **Q.**   And the U.S. Marshals, had they indicated a person they

2  were looking for?

3  **A.**   Yes, sir.

4  **Q.**   Who was this person?

5  **A.**   Jason Smith.

6  **Q.**   Jason Lamont Smith?

7  **A.**   Yes, sir.

8  **Q.**   Did they indicate there were federal warrants for him?

9  **A.**   Yeah.  They said that he was wanted.

10  **Q.**   Now, in order to assist with that arrest, did they convey

11  to you a photo of this individual?

12  **A.**   Yes, they did.

13  **Q.**   Did you have that photo when you were doing the

14  surveillance with your partner?

15  **A.**   Yes, we did.

16  **Q.**   Can you then describe what happened with your

17  surveillance?

18  **A.**   We were told that Mr. Smith was going to be arriving at a

19  liquor store at the corner of Sample and Kentucky.  Me and my

20  partner went and sat up just to the south of the liquor store

21  and started our surveillance.

22  **Q.**   Is this in South Bend?

23  **A.**   Yes, it is.

24  **Q.**   Had you been notified about the vehicle that he was going

25  to be in?

1    **A.**    Yeah.  It was going to be a white Chevy Malibu.

2    **Q.**    When you got to that location, did you see a white Malibu?

3    **A.**    Approximately ten, fifteen minutes after we were there, a

4    white Chevy Malibu pulled into the lot and backs up to the

5    front of the building.

6    **Q.**    What did you then do?

7    **A.**    Me and my partner pull out from where we were, turned into

8    the liquor store lot.  His car is facing this way (indicating).

9    We come, both look over, and we both confirmed that that was

10   the individual in the photo in the driver's seat.

11         **MR. VANDERCOY:**  Judge, I'll object to the statement

12   that they both confirmed as not responsive and a volunteer

13   statement.

14         **THE COURT:**  I'm going allow to answer.  The objection

15   is overruled.

16   **BY MR. REILANDER:**

17   **Q.**    Let's just talk, more specifically, about what exactly

18   happened.

19         What were you in your partner in?

20   **A.**    What were we in?

21   **Q.**    Yeah.

22   **A.**    In our plain detail vehicle.

23   **Q.**    Oh.  You're both in the vehicle?

24   **A.**    Yes, sir.

25   **Q.**    And then you said you were driving in the parking lot?

1   **A.**    Yep.

2   **Q.**    And where was the individual that you saw?

3   **A.**    That we saw?  That we were looking for?  In the driver's

4   seat of the Malibu.

5   **Q.**    Was there any other person in that Malibu?

6   **A.**    Yes, there was.  There was a Hispanic male in the

7   passenger's seat.

8   **Q.**    When you drove past, that vehicle was parked, I presume?

9   **A.**    Uh-huh.

10   **Q.**    Is that a "yes"?

11   **A.**    Yes, sir.

12   **Q.**    How far were you, do you think, from the individual in the

13   vehicle that you saw?

14   **A.**    Probably from here to maybe where you are, maybe a little

15   closer (indicating).

16   **Q.**    So like --

17   **A.**    I mean, ten, fifteen feet.

18   **Q.**    From one vehicle to the other vehicle?

19   **A.**    Right.  Yeah.

20   **Q.**    Now, the individual in the driver's seat, can you describe

21   what he looked like?

22   **A.**    Yeah.  The picture we had, he was a male black, with a hat

23   and beard, and matched the description almost identically; had

24   a hat on, beard, you know.

25   **Q.**    To the photo that you had?

1   A.   Yes.

2   Q.   Okay.  And what did this individual -- did he look at you

3   also?

4   A.   Yeah.  We almost -- it seemed like we locked eyes.  And

5   that's when -- I don't know if he knew we were policemen, but

6   that's when he began to exit the parking lot.

7   Q.   Can you identify that same individual here in court today?

8   A.   Yes, I can.

9   Q.   Where is that individual?

10   A.   He's sitting right there, green jail uniform (indicating).

11   Q.   And just to be clear, that's the individual that was in

12   the driver's seat of that car?

13   A.   Yes.  Yes, sir.

14          MR. REILANDER:  Sorry, Your Honor.

15          Can the record reflect an identification of the

16   defendant today?

17          THE COURT:  Any objection, Mr. Vandercoy?

18          MR. VANDERCOY:  I'm sorry.  Judge, I had a hard 7

19   hearing.

20          THE COURT:  Any objection?

21          MR. VANDERCOY:  Any objection to the identification?

22          THE COURT:  Yes.

23          MR. VANDERCOY:  No, Your Honor.

24          THE COURT:  The record will so show.

25   BY MR. REILANDER:

1   **Q.**   After you drove past and you locked eyes with this

2   individual, what exactly happened next?

3   **A.**   He began to exit the lot.

4            Me and my partner relayed to the other units, "Yes,

5   this is the subject.  You guys can move in."  We go through the

6   parking lot, pull a U-turn so we're behind him as he's exiting.

7            He can see the marked units coming.  They got their

8   lights on.  As they're moving in, the Malibu takes off.

9   **Q.**   You mentioned units.  What do you mean by units?

10  **A.**   Other police -- police officers in our unit.

11  **Q.**   As part of this assignment, were there other marked

12  vehicles with other officers involved?

13  **A.**   Yeah, there was marked and unmarked, full emergency,

14  lights and sirens.

15  **Q.**   Were you in contact with these other individuals over the

16  radio?

17  **A.**   Yes, we were.

18  **Q.**   So you mentioned you made a U-turn in the parking lot, and

19  you're now facing the other direction in the parking lot; is

20  that right?

21  **A.**   Yeah, we're right behind the suspect vehicle.

22  **Q.**   Had he pulled out?

23  **A.**   Yeah.  He was beginning to pull out, yes.

24  **Q.**   And where was he directing himself now?

25  **A.**   To go northbound on Kentucky.

1    Q.    Out of the parking lot?

2    A.    Out of the parking lot.

3    Q.    Before he starts going northbound on Kentucky, is that a

4    point where you've already contacted the other agents in the

5    area?

6    A.    Yeah.  We told them -- as soon as we -- me and my

7    partner -- said, "That's the guy," we were telling them that

8    they could start moving in, yes.

9    Q.    Did you see the other units then come into the scene?

10   A.    Yes.

11   Q.    And what did you see in particular?

12   A.    Four squad cars with lights on, coming, you know, to try

13   to eliminate a pursuit and box them in, yeah.

14   Q.    What happened next?

15   A.    A pursuit.  When he saw the squad cars, it was -- he took

16   off.

17          And, you know, we're plain clothes so we just

18   stopped.  We can't assist in any of that.

19   Q.    Just in particular, you said -- did he pull out of the

20   parking lot?

21   A.    Yeah, he was pulling out.

22   Q.    And when he pulled out, were there other police vehicles

23   behind him?

24   A.    Yes.

25   Q.    Did they have lights on at that point?

1   **A.**   Yes, they did.

2   **Q.**   Did they have sirens on?

3   **A.**   Yes, they did.

4   **Q.**   And what happened with the white Malibu then?

5   **A.**   It took off.

6   **Q.**   And the other police vehicles, what did they do?

7   **A.**   They chased after the Malibu.

8   **Q.**   When they were driving after the Malibu, did they have

9   their lights on?

10  **A.**   Yes, they did.

11  **Q.**   Did they have their sirens on?

12  **A.**   Yes, they did.

13  **Q.**   Was one of the officers, as part of the assignment, an

14  officer named Alex Williams?

15  **A.**   Yes, he is.

16          **MR. REILANDER:**  That's all, Your Honor.

17          **THE COURT:**  Thank you.  Thank you, Mr. Reilander.

18          Mr. Vandercoy, any Cross?

19          **MR. VANDERCOY:**  Thank you.

20                    **CROSS-EXAMINATION**

21  BY MR. VANDERCOY:

22  **Q.**   Officer, what type of vehicle were you driving?

23  **A.**   An unmarked vehicle.  We use that vehicle for narcotics

24  operation so it was unmarked.

25  **Q.**   Okay.  Does it have tinted windows?

1   **A.**   No.

2   **Q.**   No tinted windows?

3   **A.**   It's not my vehicle.  I don't think they're tinted.  I'm

4   not going to make a statement on that.

5   **Q.**   You don't remember whether they're tinted or not?

6   **A.**   I don't think they're tinted, no, sir.

7   **Q.**   Okay.  How often did you use that vehicle?

8   **A.**   My partner?  That's my partner's vehicle.  It's not mine.

9   **Q.**   How often did you use the vehicle?

10  **A.**   Hardly ever.

11  **Q.**   Okay.

12  **A.**   That is my partner's vehicle.  I've got my own car.

13  **Q.**   Okay.  So you're not normally in that vehicle?

14  **A.**   No, sir.

15  **Q.**   Okay.  And you saw the same thing that your partner saw

16  that day; is that correct?

17  **A.**   Yes, sir.

18  **Q.**   Are you aware that your partner described the passenger as

19  a light-skinned black male or possibly a Hispanic male in the

20  passenger's seat?

21  **A.**   I don't recall him saying that.

22  **Q.**   Okay.

23          **MR. VANDERCOY:**  Can I approach, Your Honor?

24          **THE COURT:**  You may.

25  \\\

1   **BY MR. VANDERCOY:**

2   **Q.**   I want to show you a police report.

3           Is your partner Rodolfo Esparza?

4   **A.**   It is.

5   **Q.**   Here is the report.  If you want to read that and then the

6   next page, also, just to yourself.

7   **A.**   Okay.

8   **Q.**   Okay.  So would you agree with me that your partner

9   described the passenger as a light-skinned black male or

10  possibly a Hispanic male in the front passenger's seat?

11  **A.**   Yes, sir.

12  **Q.**   And you saw the same thing he did, right?

13  **A.**   Yes, sir.

14  **Q.**   Okay.  Were you -- I'm not sure I understand your role.

15          Were you authorized to make an arrest that day?

16  **A.**   We were not specifically authorized to make the arrest.

17  **Q.**   Okay.

18  **A.**   We were just there for confirmation.

19  **Q.**   Okay.

20  **A.**   And surveillance of that sort.

21  **Q.**   And you said you were -- you were very close to the person

22  that you thought was Mr. Smith; is that right?

23  **A.**   Yeah.  I would say ten, fifteen feet.

24  **Q.**   Okay.  Is there any reason why you didn't try to block the

25  vehicle at that point or park in a manner where --

1  **A.**   I was not driving.  I'm not going to speculate on that,

2  what my partner -- why he didn't do something.  I don't know.

3  **Q.**   Okay.  So you were in the passenger's seat?

4  **A.**   I was in the passenger's seat, yes, sir.

5  **Q.**   Okay.  So you were farther away than your partner from

6  Mr. Smith and the occupant in the passenger's seat of the

7  target vehicle?

8  **A.**   Yeah, roughly a foot.

9  **Q.**   A foot, okay.

10  **A.**   I mean, that's what I would say, between me and my

11  partner.

12  **Q.**   Okay.  Okay.  Do you have the photo that you were provided

13  regarding Mr. Smith?

14  **A.**   Yes, sir.

15  **Q.**   Where is it at?

16  **A.**   It's on my cell phone.

17  **Q.**   Can you show it to us?

18  **A.**   (Indicating).

19          **MR. VANDERCOY:**  Could I approach again, Judge?

20          **THE COURT:**  You may.

21  BY MR. VANDERCOY:

22  **Q.**   Thank you.

23  **A.**   You're welcome.

24  **Q.**   It's a photo of Mr. Smith with a hat; is that correct?

25  **A.**   Yes, sir.

1   Q.   Thank you.

2        You've indicated that you were told that Mr. Smith

3   would be arriving at the liquor store in a white Chevy Malibu?

4   A.   Yes, sir.

5   Q.   And then you saw a white Chevy Malibu arriving at the

6   liquor store, right?

7   A.   Correct.

8   Q.   Did the fact that you had been told that's what he would

9   be driving and arriving at a certain point -- when you actually

10  saw that, did that influence your identification of the driver

11  of the white Chevy Malibu arriving at the liquor store?

12  A.   No, sir.  That's why we drove through the lot, both me and

13  my partner, to confirm that was the person indeed.

14  Q.   Okay.

15       MR. VANDERCOY:  Judge, could I have a moment?

16       THE COURT:  Sure.

17       **(Discussion held out of stenographer's hearing.)**

18       MR. VANDERCOY:  I have no further questions, Your

19  Honor.

20       THE COURT:  Thank you, Mr. Vandercoy.

21       Any Redirect?

22       MR. REILANDER:  Nothing for this witness.

23       THE COURT:  You may step down, Officer Rush.  Thank

24  you.

25       **(Witness excused.)**

1          MR. REILANDER:  May the government call its next

2   witness?

3          THE COURT:  Before you're seated, raise your right

4   hand and face this lady here (indicating).

5                    ALEXANDER WILLIAMS,

6   Government's witness, sworn, examined, testified as follows:

7                    DIRECT EXAMINATION

8   BY MR. REILANDER:

9   Q.   Can you please state and spell your name for the record?

10  A.   My name is Officer Alexander Williams.  A-L-E-X-A-N-D-E-R

11  W-I-L-L-I-A-M-S.

12  Q.   And what do you do for a living?

13  A.   I'm assigned to the Strategic Focus Unit for the South

14  Bend Police Department.

15  Q.   How long have you been with the South Bend Police

16  Department?

17  A.   Since March of 2019.

18  Q.   I want to turn your attention to May 18, 2023.

19          What were you doing that day?

20  A.   Working within the capacity of my assignment with the

21  Strategic Focus Unit, and then we were tasked to assist U.S.

22  Marshals trying to apprehend a subject named Jason Smith.

23  Q.   Had you been advised there were warrants for his arrest?

24  A.   I was.

25  Q.   Were you working with a group of other law enforcement

1  officers?

2  **A.**   Yes, sir, I was.

3  **Q.**   Where did you go that day?

4  **A.**   We were told that Jason Smith was going to be at the

5  shopping mall building at Sample and Kentucky Street in South

6  Bend.  And three other officers and I had been staged behind

7  the South Bend Chocolate Factory building just west of that on

8  Sample Street.

9  **Q.**   What were you in?

10  **A.**   I was in an unmarked silver Ford Taurus patrol vehicle

11  equipped with emergency lights and siren.

12  **Q.**   Were you in radio contact with the other individuals?

13  **A.**   Yes, sir, I was.

14  **Q.**   In particular, were you in radio contact with Officer Rush

15  and his partner?

16  **A.**   Yes, sir, I was.

17  **Q.**   What did you hear from them?

18  **A.**   We were waiting behind the building for the subject to

19  show up.  We were told that he would be in a white Chevy

20  Malibu.  And then Officer Rush advised a white Malibu had just

21  arrived and was parking in a parking spot near the liquor

22  store.  And then he had then drove by the vehicle and said that

23  that was, in fact, Jason Smith in the driver's seat of the

24  vehicle.

25  **Q.**   What happened?  What did you do then at that point?

1    **A.**    So once we were given confirmation that Jason Smith was

2    there in the vehicle, other officers and I -- I was the first

3    one in the line of vehicles -- then drove to the liquor store

4    in attempt to apprehend him.

5    **Q.**    How far is this Chocolate Factory from the liquor store?

6    **A.**    Very short distance.  Takes seconds to get there.

7    **Q.**    When you pulled up from around the factory, could you see

8    the liquor store?

9    **A.**    Yes, sir, I could.

10   **Q.**    When you first saw the liquor store, what did you see?

11   **A.**    See the liquor store.  And then as we're pulling out on

12   Sample Street, Officer Rush advises that the subject was

13   backing out and getting ready to leave.  And then it's in real

14   time.  As I'm going down Sample Street, he says --

15           **COURT REPORTER:**  Please slow down.

16           **THE WITNESS:**  Oh, I'm sorry.

17   **A.**    He says -- as I pull out, he says, "The subject is getting

18   ready to leave.  He's going toward the exit of the parking

19   lot."

20           I then see a white Malibu, like the white Malibu,

21   exiting the parking lot to go on Kentucky Street.  And then I

22   turn my lights on as I'm turning on Kentucky Street to attempt

23   a vehicle takedown.

24   **BY MR. REILANDER:**

25   **Q.**    Let's back up a little bit here.

1   A.   Okay.

2   Q.   You said you were pulling onto Kentucky Street?

3   A.   Yes, sir.

4   Q.   And is the parking lot right there on Kentucky Street on

5   the corner?

6   A.   Yes, sir, it is.

7   Q.   On the corner of Kentucky and Sample?

8   A.   Yes, sir.

9   Q.   Is that in South Bend?

10  A.   Yes, sir.

11  Q.   When you turn on to Kentucky Street, do you see the Chevy

12  Malibu right there in the parking lot?

13  A.   Yes, sir, I do.

14  Q.   And is it pulling out at that point?

15  A.   Yes, sir, it is.

16  Q.   Do you see the Officer Rush undercover vehicle there also?

17  A.   I don't remember seeing him there.  I was focusing on the

18  Malibu at that point.

19  Q.   How close was your car to the Chevy Malibu when it was

20  pulling out of the parking lot?

21  A.   I pulled out right next to his vehicle with my lights on,

22  so we got pretty close, on the driver's side of his vehicle.

23  Q.   Within a couple feet away from the vehicle?

24  A.   Yes, sir.

25  Q.   So you're in your vehicle, and he's next to you; is that

1    right?

2    **A.**    Yes, sir.

3    **Q.**    At that point, did you have your lights on?

4    **A.**    Yes, sir, I did.

5    **Q.**    And then what happened with the Malibu at that point?

6    **A.**    He accelerated away from me and started driving north on

7    Kentucky Street.  I then activated my siren, and we initiated a

8    vehicle pursuant.

9    **Q.**    Did you start driving after the Malibu?

10   **A.**    Yes, sir, I pursued it.

11   **Q.**    Were you in the vehicle immediately behind the Malibu?

12   **A.**    Yes, sir, I was.

13   **Q.**    Behind you, were there other patrol cars?

14   **A.**    There would have been three; one unmarked patrol vehicle

15   and two fully marked patrol vehicles.

16   **Q.**    And what were they doing while you're driving up Kentucky

17   Street?

18   **A.**    The same thing I was.  They had their lights activated.

19   And then when the pursuit initiated, we all had our sirens

20   activated.

21   **Q.**    So a line of almost perhaps four cars?

22   **A.**    Yes, sir.

23   **Q.**    When you were going up Kentucky, then what happened?

24   **A.**    Pursued him up to Western Avenue.  He disregarded the stop

25   sign right there, went around a vehicle on the left side,

1    turned west onto Western.  I continued pursuing him, reached a

2    top speed of about 105 miles-an-hour.  Going around vehicles,

3    going through intersections.  And then he turned north onto

4    Mayflower.

5    Q.    At Mayflower, was there a red light there at Mayflower?

6    A.    Yes, sir, there was.

7    Q.    You turned right on Mayflower?

8    A.    Yes, sir, we did.

9    Q.    Is Mayflower a single lane, no-passing road?

10   A.    Correct.  Yes, sir.

11   Q.    What happened when you were pursuing on Mayflower?

12   A.    There was a big utility truck that he almost collided

13   with.  And then I got back behind him on Mayflower.  There was

14   slow traffic.  He went on the right onto the shoulder to get

15   around the vehicles to continue so he could flee from me.  And

16   then at that point, he about spun out.  Like, he hit dirt.  His

17   car started sliding.  He went into the oncoming lane at that

18   point.

19   Q.    The dirt on the shoulder?

20   A.    Yes, sir.

21   Q.    You still pursued him?

22   A.    Yes, sir, I did.

23   Q.    Again, with the lights and sirens?

24   A.    Correct.

25   Q.    Did he at this point go around other vehicles?

1  A.    Yes, sir.  He regained control of his vehicle.  And then

2  there was a red light just north of where that happened.  And

3  then he went through that red light without slowing down and

4  almost collided with a man on a motorcycle.

5  Q.    What happened to the pursuit after that?

6  A.    I continued pursuing him up into Michigan.  And then we

7  reached a top speed of 121, I believe.  The whole pursuit

8  lasted about 27 minutes.  We went through Niles and then turned

9  onto Pulaski Highway.

10          And then our handheld radios -- we started to lose

11 communication, so we terminated the pursuit, and Michigan took

12 over.

13 Q.    You said you lost radio signal; is that right?

14 A.    Correct.

15 Q.    Because you were just getting too far away from South

16 Bend?

17 A.    Correct.

18 Q.    When you stopped your pursuit, what happened then?

19 A.    We pulled over.  And then, I think it was Berrien County,

20 they took over the pursuit.  And then we continued driving

21 west, but we were no longer in the pursuit.  We didn't have

22 lights or sirens on or anything.  And then we were advised that

23 Berrien County had lost sight of the vehicle and the pursuit

24 had stopped.

25 Q.    So the pursuit stopped?

1    A.    Yes.  After we lost sight of the vehicle, then it turns

2    into like looking for the car.

3    Q.    Was the Malibu recovered, though?

4    A.    Yes, it was.

5    Q.    And where was it locate3d?

6    A.    We were told that the Marshals in Berrien County found it

7    on Redbud Trail.  I forgot -- it's just north of a street.  I

8    forgot what street it is, but it's in Niles, Michigan.

9    Q.    Did you go to that location?

10   A.    Yes, sir, I did.

11   Q.    And did you see the Malibu there?

12   A.    I did.

13   Q.    And what happened to the occupants of the vehicle?

14           COURT REPORTER:  I'm sorry.  I'm sorry.  I lost you.

15           "Did you go to that location," and then I lost you.

16           Please slow down, sir.

17           THE WITNESS:  Yes, ma'am.

18   A.    I went to the location.

19   BY MR. REILANDER:

20   Q.    So let's go back up.  I said:  Did you go to the location

21   of the vehicle?

22   A.    Yes, sir, I did.

23   Q.    And what did you see at that location?

24   A.    I saw the white Malibu on the side of the street, and we

25   were advised that the vehicle had ran out of gas.

1          **MR. VANDERCOY:**  Judge, I have to object to the "we

2     were advised," the hearsay.

3          **THE COURT:**  The objection is sustained unless you

4     wish to have argument on it.

5     **BY MR. REILANDER:**

6     **Q.**   The Malibu vehicle, were there two occupants there?

7     **A.**   There was one there when I got there.

8     **Q.**   And who was that occupant?

9     **A.**   The passenger.

10    **Q.**   Where was the driver?

11    **A.**   Gone.

12    **Q.**   Did you start looking for the driver?

13    **A.**   Yes, sir.

14          Like, the marshals were already looking for him, and

15    then I went to go help look for him, and we did not find him.

16    **Q.**   You mentioned that the pursuit was about 25 minutes from

17    South Bend up into Michigan?

18    **A.**   Yes, sir.

19    **Q.**   During that whole time, did you have lights and sirens

20    running?

21    **A.**   Yes, sir, I did, up until we terminated our pursuit.

22    **Q.**   Let me pose the question this way:  Was there any

23    possibility that he did not know that you were seeking to stop

24    him?

25    **A.**   No, sir, there's no way he couldn't have known that.

1          **MR. REILANDER:**  That's all, Your Honor.

2          **THE COURT:**  Thank you, Mr. Reilander.

3          Mr. Vandercoy, any Cross?

4          **MR. VANDERCOY:**  Yes, Your Honor.  Thank you.

5                          **CROSS-EXAMINATION**

6   BY MR. VANDERCOY:

7   Q.    You indicated you were parked behind a building initially?

8   A.    Yes, sir.

9   Q.    And what building is that?

10  A.    The South Bend Chocolate Factory on Sample Street.

11  Q.    Okay.  And you also advised that you were advised of

12  something from Officer Rush regarding an identification; is

13  that right?

14  A.    Correct.

15  Q.    Okay.  So you did not have eyes on the location where the

16  white Chevy Malibu was parked at that mall-like location?

17  A.    No, sir, I didn't see it until I had driven to that

18  location.

19  Q.    Okay.  And you indicated it took you about fifteen seconds

20  to get there.

21          Did you say "fifteen" or "fifty"?

22  A.    I said like seconds.  I don't know exactly how long it

23  took me, but it was very quick.

24  Q.    Okay.  But you were relying upon someone else's

25  identification; is that correct?

1  **A.**   Correct.

2  **Q.**   You never made a positive identification of Mr. Smith

3  operating the vehicle at that point in 7?

4  **A.**   No, sir.

5  **Q.**   And, in fact, you never made a positive identification of

6  Mr. Smith operating the vehicle at any point?

7  **A.**   No, sir.

8  **Q.**   When you said, "No, sir," you mean the statement is

9  correct, right?

10  **A.**   Yes.  I'm sorry.

11       I never saw -- I never made the identification.  That

12  was Officer Rush.

13  **Q.**   Okay.

14       **MR. VANDERCOY:**  Could I have a moment, Judge?

15       **THE COURT:**  You may.

16       **(Discussion held out of stenographer's hearing.).**

17       **MR. VANDERCOY:**  Nothing else, Your Honor.  Thank you.

18       **THE COURT:**  Thank you, sir.

19       Any Redirect, Mr. Reilander?

20       **MR. REILANDER:**  No, Your Honor.

21       **THE COURT:**  You may step down, Officer Williams.

22  Thank you.

23       **THE WITNESS:**  Thank you.

24       **(Witness excused.)**

25       **THE COURT:**  Does that conclude the government's

1    witnesses?

2              **MR. REILANDER:**  Yes, Your Honor.

3              **THE COURT:**  Does the defense plan to call any

4    witnesses?

5              **MR. VANDERCOY:**  Could I have a moment, Judge?

6              **THE COURT:**  We'll go ahead and take a break of about

7    fifteen minutes since Mr. Smith will have to get -- they'll

8    have to get the marshals down and back up.  We'll take our

9    fifteen-minute morning break and do that as part of that.

10             **LAW CLERK:**  All rise.

11             **(All comply; short recess taken.)**

12             **THE COURT:**  Any witnesses or evidence for the

13   defense?

14             **MR. VANDERCOY:**  Yes, Your Honor.  Mr. Smith would

15   like to make a statement.

16             And I assume the Court will want it to be by formal

17   testimony?

18             **THE COURT:**  Yes, please.

19             **MR. VANDERCOY:**  Mr. Smith.

20             **THE COURT:**  You don't have to be sworn in again, sir,

21   because you're still under oath.

22             **THE WITNESS:**  Okay.

23                        **JASON SMITH,**

24   **Defendant herein, sworn, examined, and testified as follows:**

25                   **DIRECT EXAMINATION**

1    **BY MR. VANDERCOY:**

2    **Q.**    Would you tell us your name, please?

3    **A.**    Jason Lamont Smith.

4    **Q.**    Mr. Smith, did you make any calls to the Probation Office

5    to determine whether or not there was a warrant for your

6    arrest?

7    **A.**    Yes, sir.

8    **Q.**    Why did you do that?

9    **A.**    Well, my girlfriend had called me and said that the

10   marshals had just left her job at McDonald's.  And so I called

11   into the probation officer to talk to Mr. Abram Jones.  But

12   when I called in, a lady picked up the phone.  She said that

13   Abram Jones wasn't a probation officer here no more, and then

14   she connected me to some guy that picked up the phone.

15   **Q.**    Okay.  And what were you advised or what did you ask?

16   **A.**    I asked him did I need -- I said I was confused as to why

17   they was at my girlfriend's job looking for me.  And so I asked

18   him, I said, "Do I need to come and turn myself in?  Do I need

19   to come in to talk to somebody?"

20   **Q.**    Okay.  Did you receive a response to your question?

21   **A.**    And he asked me was this my phone number.

22           I told him, "Yes."  And I said did I need to bring

23   myself in.

24           He said, No.  We will get back to you."

25           Nobody called me and got back to me, so I was

1    confused at that point right there.

2    **Q.**   Do you know who you spoke to within the probation office?

3    **A.**   No, I don't.

4    **Q.**   But you know that it was not your probation officer

5    because you were advised that he had left?

6    **A.**   Yes, sir.

7    **Q.**   Is that all you wanted to say?

8    **A.**   Yes, sir.

9            **MR. VANDERCOY:**  Okay.  I have no further questions,

10   Your Honor.

11           **THE COURT:**  Thank you, Mr. Vandercoy.

12           Any Cross, Mr. Reilander?

13           **MR. VANDERCOY:**  Judge, I'm sorry.  Could I reopen my

14   direct?

15           **THE COURT:**  You may.

16           **MR. VANDERCOY:**  Thank you.

17               **DIRECT EXAMINATION (CONTINUED)**

18   BY MR. VANDERCOY:

19   **Q.**   Mr. Smith, have you been advised that you tested positive

20   for colon cancer?

21   **A.**   Yes, sir.

22           **MR. VANDERCOY:**  Thank you.

23           Nothing else, Judge.

24           **MR. REILANDER:**  No, Your Honor.  I have nothing.

25           **THE COURT:**  You may step down, Mr. Smith.  Thank you.

1          **(Witness excused.)**

2          **THE COURT:**  Any further evidence for the defense?

3          **MR. VANDERCOY:**  No further evidence, Your Honor.

4          **THE COURT:**  Any rebuttal for the government?

5          **MR. REILANDER:**  No, Your Honor.

6          **THE COURT:**  Any argument for the government?

7          **MR. REILANDER:**  Your Honor, briefly, on the technical

8  violations.

9          We're going to concede not Violation Number 1

10  regarding June 22nd.

11          There's -- one, two, three, four -- four other

12  marijuana violations:  Two that Mr. Smith has admitted to; two

13  that, I believe, have been established by Mr. Jones with regard

14  to the November 4th event where he tested positive for

15  marijuana but he denied that; and then the

16  February 23rd event when he's directed to report to Probation

17  Office but failed to report.  So I would submit that those

18  violations, 2, 3, 4, and 5, have been established by the

19  testimony of Mr. Jones.

20          Condition Number 11, Violation Number 1, the

21  government will drop that violation.

22          And then the four other violations with regard to the

23  drug treatment program the government will not pursue either.

24          Now, with regard to the substantive -- the Grade B

25  violation for committing another state offense, the government

1  submits that the testimony of the two officers today establish

2  that there's been sufficient evidence to find that Mr. Smith

3  committed the offense -- the Indiana offense of resisting law

4  enforcement.

5      You heard testimony, Your Honor, today from the two

6  officers, one officer who identified Mr. Smith as being in that

7  white Malibu, and then the subsequent officer, Williams, is on

8  the scene with that white Malibu in the same parking lot, and

9  then there's a pursuit with lights and sirens.  Mr. Smith knew

10  that he was being stopped by police and did not stop and led

11  that chase for 25 minutes.  That is sufficient to establish the

12  state offense of resisting law enforcement, and the government

13  submits that the evidence supports that, and that's a

14  violation, of course, of his supervised release, and the Court

15  should find that.

16      Thank you.

17      **THE COURT:**  Thank you, Mr. Reilander.

18      Mr. Vandercoy.

19      **MR. VANDERCOY:**  Thank you.

20      Judge, we disagree with the government's review of

21  the evidence.  We think the government has established only two

22  of the marijuana violations, those which Mr. Smith admitted.

23      Also, we contest the identification.  I think the

24  police officer testified that he saw the same thing that his

25  partner did and admitted that what his partner saw was possibly

1   a light-skinned black male in the passenger's seat of that

2   vehicle and with no other identification of the driver.  So we

3   believe that the government has not succeeded in proving their

4   case.

5          With regard to sentencing --

6          **THE COURT:**  Why don't we hold off on that.  Let me go

7   ahead and make a finding which, if any, have been violated, and

8   then I'll invite the comment on the resolution.

9          **MR. VANDERCOY:**  Okay.  Thank you.

10         **THE COURT:**  I am persuaded that there have been four

11  violations of the conditions of supervised release, those

12  being, first of all, the two that Mr. Smith admitted, both at

13  the time the urine specimen was taken and then corroborated by

14  the positive result July 25th of 2022 and December 5th of

15  2022.  Both urine tests were positive for marijuana, and

16  Mr. Smith said that he had used.

17         On November 4th, he gave a test -- or gave a sample

18  that tested positive for marijuana, and I do find, despite his

19  denial, based on the tests, that he did use marijuana sometime

20  on or before November 4th at a 7 that he was on supervised

21  release.

22         Violation Number 5 under that condition is not that

23  he tested positive, but that he failed to report, and I believe

24  that Probation Officer Jones' testimony establishes that, as

25  well.  That was on February 23rd, 2023.

1     The other allegations with respect to use of

2 marijuana, I think, one was withdrawn, one where the sample was

3 taken six days after Mr. Smith's release from the Department of

4 Correction.

5     As far as notifying the probation officer within 72

6 hours of being arrested or questioned by a law enforcement

7 officer, the government has indicated it would not proceed on

8 that.

9     The other four alleged violations involving the

10 treatment program, I think, fail for want of proof in light of

11 the confrontation clause ruling that I made.

12     Going to Mandatory Condition Number 1, which is the

13 bigger-ticket item, obviously, committing another federal,

14 state, or local crime, Violations 1 and 3, the government

15 indicated at the outset of hearing that it was withdrawing

16 those and so presented no evidence.

17     Violation Number 2, I believe, has been proven.  My

18 recollection of the testimony is that Officer Rush said that he

19 looked over and he recognized Mr. Smith and that his partner

20 concurred.  The person they were trying to identify, that they

21 have different racial identifications, even though they were

22 both looking at the same thing, doesn't undermine my confidence

23 in the identification of Mr. Smith.  I suppose there's a remote

24 chance that Officer Rush was mistaken, but it's not a very

25 significant possibility.

1          So I do find that the following amount to violations

2     of the conditions of supervised release:  First, that on or

3     around May 18th of 2023, the defendant committed the felony

4     Indiana crime of resisting law enforcement by fleeing from

5     police officers at high rates of speed and across state line;

6     and then that Mr. Smith accurately tested positive for the

7     presence of marijuana on July 25th of 2022, November 4th of

8     2022, and December 5th of 2022, and then failed to appear on

9     February 23rd, 2023.

10         Mr. Vandercoy, if you now wish to be heard.

11         I guess we've been going with the Government going

12    first, so let's stay with that, and then we'll come to you.

13         **MR. VANDERCOY:**  Thank you.

14         **THE COURT:**  Mr. Reilander.

15         **MR. REILANDER:**  Thank you, Your Honor.

16         The government recommends a 21-month sentence with

17    one year additional supervised release to follow.

18         **THE COURT:**  I want to be sure I heard you.  You said

19    20-month sentence?

20         **MR. REILANDER:**  21-month sentence.

21         **THE COURT:**  21, okay.

22         **MR. REILANDER:**  With one year of supervised release

23    to follow.  That's the same recommendation the Probation Office

24    makes in its summary report.

25         Mr. Smith's violations happened relatively early in a

1  three-year release period, which is the reason for the

2  additional year of supervised release following.

3          The 21-month recommended sentence is the low end of

4  the guideline range because this is a Grade B violation based

5  on Mr. Smith's criminal history.  I believe it's a 21- to

6  27-month guideline range.  21 months is the low end of that

7  range.  That's what probation recommends.  The government also

8  recommends, as I said, with an additional one year supervised

9  release following.

10         Thank you.

11         **THE COURT:**  Thank you, sir.

12         **MR. VANDERCOY:**  Could I have a moment, Judge?

13         **THE COURT:**  Sure.

14         **(Discussion held out of stenographer's hearing.)**

15         **MR. VANDERCOY:**  Your Honor, when Mr. Smith was placed

16  on supervised release, he didn't have the normal opportunity to

17  adjust to society and to accumulate some small amount of funds

18  to support himself through the normal reentry process of a

19  halfway house.

20         The other factor which appears, I think, evident from

21  the record is that Mr. Smith needs mental health treatment.  He

22  was given the opportunity to receive drug treatment, but it

23  seems reasonably clear that he needs mental health treatment at

24  least as strongly as he needs treatment for substance abuse.

25         Because that's the case, because he needs mental

1  health treatment and has not received it within the criminal

2  justice system, and he also needs medical treatment, he's

3  passed several dark blood clots which resulted in testing for

4  colon cancer, and he's indicated -- and I think -- I think --

5  although I don't have the medical record, I think it has been

6  confirmed that he has tested positive for colon cancer.

7         In addition to those factors, he has a child due

8  December 27th with his girlfriend and long-time -- well,

9  friend.

10        And so we would ask that the Court fashion a sentence

11 which permits him to get medical treatment, some type of mental

12 health treatment; some type of sentence involving house arrest

13 or some type of confinement here in the community so that he

14 can get treatment.  He has not received treatment, as I

15 indicated, in the correctional system, and so we would ask that

16 he be afforded that opportunity.

17        He was making an effort to adjust.  He did go to the

18 Victory Clinic.  But as I indicated, I think the strongest need

19 that the record demonstrates is the need for mental health

20 treatment.

21        He's been under significant pressure.  He's been

22 passing these blood clots for some period of 7.

23        And also while he was incarcerated, his father and

24 his brother died.  So he -- although -- I mean, there's some

25 indication that he needed mental health treatment in years

1  past.  It becomes more clear that he has been subjected to a
2  significant amount of stress in his personal life and that that
3  has, in fact, been detrimental to his mental health.  He
4  clearly needs treatment as soon as possible.
5         He clearly needs physical treatment, physical in the
6  sense of physical ailment for the potential and likely colon
7  cancer so that the non-treatment of that disease does not turn
8  into a death sentence for him.
9         Thank you.
10        **THE COURT:**  Has Mr. Smith begun a course of treatment
11 for a mental health condition with any local provider?
12        **MR. VANDERCOY:**  No, Your Honor.
13        **THE COURT:**  No, okay.
14        **MR. VANDERCOY:**  I do not believe so.
15        **THE COURT:**  Okay.  Thank you, sir.
16        **MR. VANDERCOY:**  Thank you.
17        **THE COURT:**  Mr. Smith, you have the right to speak as
18 well.  This would not be as you testified.  You wouldn't be
19 under oath with questions.  You don't have to say anything.
20 But if you do want to add anything to what I've read and heard,
21 this would be the 7.
22        I would just ask you to stand up, keep your voice up.
23 Don't talk too fast so the reporter can write down what you
24 say.
25        **THE DEFENDANT:**  Mr. Miller, you know, I've been

1  dealing with you for thirteen years now so you know my

2  position, how I feel about everything, about the case and

3  everything.

4          Right now, like the lawyer said, the first thing is,

5  I called into this probation office, this building right here,

6  and I asked these people did I need to turn myself in after

7  they went to my girlfriend's job.  They told me, "No."

8          I'm just confused as to why I couldn't have been

9  handling this three months ago when I called in, or two months

10  ago and a half, or whenever it was.

11          I do got a baby that due on the --

12          **THE COURT:**  Let me ask.  When I say, "Let me ask,"

13  let me just interrupt for a minute.  I told you you wouldn't be

14  subject to any questions.  I don't make anybody answer any

15  questions.  But I think you're assuming that I understand what

16  difference it makes that you called in, and I'm not sure

17  exactly how that would play in.

18          So my question would be -- and you can talk to

19  Mr. Vandercoy before you answer.  I'm not trying to trap you --

20  what difference does it make that you called in after the

21  warrant was issued and they never got back to you?

22          **THE DEFENDANT:**  Well, I don't need to converse with

23  him about that.

24          I called in to try to see if they wanted me to turn

25  myself in.  I don't understand what you can't understand about

1  that.

2          THE COURT:  No, I understand.

3          How did that affect this case?

4          THE DEFENDANT:  Excuse me?

5          THE COURT:  How does that affect today's case, what I

6  have to decide today?

7          THE DEFENDANT:  How does it affect it?  Because I

8  could have already been in jail already.  You see what I mean?

9          THE COURT:  I see.  Okay.

10         THE DEFENDANT:  I mean, I did call in, and I did try.

11 They said, "No."  I mean, somebody got to be able to verify

12 that, that I called in, right.

13         THE COURT:  Okay.

14         THE DEFENDANT:  I do got a baby on the way, and I am

15 dealing with some issues.

16         Like I said, at the beginning of this case, you know

17 how I felt.  I felt I was not guilty.  The jury found me

18 guilty.  I felt the suppression hearing should have went a

19 different way, but it didn't go a different way.

20         I lost my father and my brother.  My father died of a

21 brain tumor.  My brother died of COVID, you know what I mean.

22         I admitted to smoking.  I smoked.  I smoked because,

23 after having done 11 years in federal prison, and then going to

24 the state prison, and then getting out to have to deal with all

25 that, I didn't have no support when I got out from nobody.

 1          My mother, she gave me somewhere to live.  But I

 2   didn't have nowhere to live.  I only lived there for a month

 3   probably, you know, because there was more people that had to

 4   move in to my mother's house.

 5          So I was basically was on the street, for real, for a

 6   couple weeks.  I had an issue with Mr. Abram's about that,

 7   about me not having nowhere to live.

 8          Then I ended up meeting my girlfriend at work at

 9   McDonald's, you know what I mean.

10          So I just wasn't afforded the same, you know, things

11   that everybody else was, as far as the halfway house or

12   anything.  I didn't get to readjust to the world like normal

13   people did.

14          And at the end of the day, right now, with this baby

15   on the way and all, she's not going to be able to take care of

16   the baby by herself, you know.  She's going to be on two months

17   of maternity leave.  She needs help with bills.  She needs help

18   with the baby when he's born.

19          Like, I mean, I ain't been afforded nothing.   Every

20   motion I ever filed was denied in your court, appeals court,

21   everything.  I mean, it's just -- it seems like, you know, I've

22   been railroaded at every stop.  And I'm trying to figure out is

23   this Court ever going to recognize that, you know, I need some

24   type of different help, you know what I mean, because -- maybe

25   a rehab center, you know.

1          I admit, I smoked, because I'm dealing with the death

2    of my father.  I didn't walk into my mother's and father's

3    house for a week after I got out because I couldn't walk

4    through the front door because, you know, knowing my father was

5    dead.

6          I still haven't been to my brother's grave site.  He

7    passed from COVID 19 the day after my 38th birthday.  April 6,

8    my brother died.

9          So I'm dealing with a lot of issues, you know.  And

10   I'm just being honest.

11         What is prison going to do for me if you send me back

12   for 21 months?  Nothing.  It ain't going to help me none.

13         I can't get no type of medical treatment there.

14   Prison medical is trash.  However you look at it, they don't

15   help you.

16         This county jail, they not really dealing with my

17   issue, you know, how they should be right now.  I'm sitting

18   bleeding two, three times a week, you know.  I have blood clots

19   coming out of my rectum, and I still haven't been to an outside

20   hospital.  The doctor said that he tested the blood clot in the

21   jail.  They was supposed to have got with the marshals and

22   everything.  They still haven't sent no proper paperwork to let

23   these people know what's going on with me.

24         Like, I'm dealing with a lot of stuff, and that's

25   basically it.

1          **THE COURT:**  Thank you, Mr. Smith.

2          **THE DEFENDANT:**  Uh-huh.

3          **THE COURT:**  When I first read the probation officer's

4   recommendation as to what to do about this case, what to do

5   about Mr. Smith, it seemed to me to be more than was necessary

6   because we all work in a system where we seem to think that, if

7   we can imprison people long enough, they will no longer be drug

8   users.  Mr. Smith went into prison with a heck of a drug

9   problem.  He came out, and he tested positive for using drugs.

10  The system is designed to try to imprison people out of the

11  drug problem if they still have it after the last imprisonment.

12         Further, Mr. Smith has never succeeded on finishing a

13  term of supervision, and it seemed pointless to add any

14  supervision to whatever imprisonment might be ordered.

15         That's not the case that I heard today.  What

16  Mr. Smith just described might be consistent with an addiction

17  problem or it might not.  It might be consistent with a mental

18  health problem which hasn't been treated because, as best I can

19  tell, I don't think it's been identified in the prior

20  proceedings, and maybe that would be more helpful.

21         There is also the simple fact that, while serving a

22  federal criminal sentence, Mr. Smith led police from two states

23  on a very high-risk, 27-minute police chase reaching speeds of

24  121 miles an hour and threatening many other people who were on

25  the road, motorcyclists, other drivers, not to mention the

1    officers who were trying to do their job to catch him, and he

2    did that as somebody who has a very long criminal record.

3              And having heard all of that, I think the

4    recommendation by the probation officer, which I first thought

5    was unreasonable, is reasonable.  I think that the 21 months

6    requested is reasonable, not to cure any substance abuse

7    problem -- it won't -- if there is a substance abuse problem.

8    And certainly if there is a problem, it didn't cure it when we

9    had a much longer sentence.  But it might make us all a little

10   safer by starting to get Mr. Smith's mental health treatment --

11   assuming Mr. Vandercoy is correct that that's what is needed --

12   and it will keep us all a little safer because Mr. Smith will

13   not be on the roads.

14             As far as the extra year of supervised release, given

15   the combination of mental health issues and at least past drug

16   use, and at some 7 in the past drug addiction, I think we'll

17   all be a lot safer if somebody is making sure that Mr. Smith is

18   going to the treatment programs, the treatment -- well,

19   treatment programs, counseling, whatever is set up through the

20   Probation Office because, frankly, it doesn't sound as though

21   Mr. Smith is in a position to make use of such programs without

22   the help of the probation office.

23             Again, I'm not adding supervised release or a term of

24   imprisonment as a way of helping Mr. Smith -- I hope it does --

25   but as a way of keeping everybody else a little bit safer.

1    So, based on the evidence and arguments presented

2  today, the Court finds that the defendant violated the terms of

3  his supervised release by committing the Indiana crime of

4  felony resisting law enforcement on May 18th, 2023; testing

5  positive for the use of marijuana on July 25th, 2022,

6  November 4th, 2022, and December 5, 2022; and failing to

7  report for a drug test on February 23rd, 2023.

8    Based on which, the Court revokes the defendant's

9  supervised release, sentences him to the Bureau of Prisons for

10  a term of 21 months.

11    And I would say, Mr. Smith, this is not the reason

12  for it, but I think that will get you someplace where they can

13  help you with the mental health issues.

14    A term of 21 months to be followed by 12 months on

15  supervised release, or one year on supervised release.

16    The Court recommends that the Bureau of Prisons

17  designate as the place of the defendant's confinement a

18  facility where he can receive mental health treatment.

19    Mr. Smith, I am going to modify the conditions of

20  supervision just a touch to get the mental health treatment in

21  there, too.  But because I'm modifying it, I'm going to read to

22  you the conditions of supervision so that we've got it all in

23  one place and you know what it is you have to follow.

24    First of all, you must not commit another federal,

25  state, or local crime.

1          Second, you must not unlawfully possess a controlled

2     substance.

3          Third, you must not unlawfully use any controlled

4     substance, including marijuana, and must submit to one drug

5     test within 15 days of the beginning of supervision and at

6     least two periodic tests after that for use of a controlled

7     substance.  There will be more tests than that.  That's what is

8     required by Congress.

9          Fourth, you must be lawfully employed full-time in

10    the sense of at least 30 hours a week.  If you're not employed

11    full-time, you must try to find full-time employment under the

12    supervision of the probation officer.  If you become unemployed

13    or change your employer, position, or location of employment,

14    you must tell the probation officer within 72 hours of the

15    change.  If after 90 days you don't find employment, you must

16    complete at least 10 hours of community service per week until

17    employed or participate in a job skills training program,

18    approved and directed by your probation officer.

19         Fifth, you must report in person to the Probation

20    Office in the district to which you are released within 72

21    hours of release from the custody of the Bureau of Prisons.

22    You must report to the probation officer in the manner and as

23    frequently as the Court or the probation officer directs.  And

24    you must notify the probation officer within 48 hours of any

25    change in residence and within 72 hours of being arrested or

1    questioned by a police officer.

2          Sixth, you must not travel knowingly outside the

3    federal judicial district without the permission of the Court.

4    Alternatively, the probation officer will grant such permission

5    when doing so will reasonably assure the probation officer's

6    knowledge of your whereabouts and that the travel will not

7    hinder your rehabilitation or present a public safety risk.

8          Seventh, you must truthfully answer any inquiry by

9    the probation officer and must follow the instruction of the

10    probation officer pertaining to your supervision and conditions

11    of supervision. This condition does not prevent you from

12    invoking the Fifth Amendment privilege against

13    self-incrimination.

14          Eighth, you must permit a probation officer to meet

15    at your home or any other reasonable location and must permit

16    confiscation of any contraband the probation officer observes

17    in plain view.

18          The probation officer will not conduct such a visit

19    between the hours of 11:00 p.m. and 7:00 a.m. without specific

20    reason to believe a visit during those hours would reveal

21    information or contraband that wouldn't be revealed through a

22    visit during those hours. During regular hours. Excuse me.

23          Ninth, you must not meet, communicate, or otherwise

24    interact with persons whom you know to be engaged or planning

25    to be engaged in criminal activity.

1         Tenth, you must not possess a firearm, ammunition,

2  destructive device, or any other dangerous weapon, meaning an

3  instrument designed to be used as a weapon and capable of

4  causing death or serious bodily harm.

5         Eleventh, you must not enter into any agreement to

6  act as an informant or special agent of a law enforcement

7  agency without the Court's permission.

8         And, then, finally -- and this is the one I'm

9  modifying, sir -- twelve, unless an assessment at the time of

10  release from imprisonment or commencement of probation

11  indicates to the Court that participation is unnecessary, you

12  must participate in a substance abuse treatment program or

13  after-care program and a mental health treatment program or

14  after-care program.  The Court will receive notification of

15  such assessment.  You must abide by all treatment program

16  requirements and restrictions consistent with the conditions of

17  the treatment provided.  You will be required to participate in

18  drug and/or alcohol testing not to exceed 85 drug and/or

19  alcohol tests per year.  At the request of a treatment

20  provider, probation officer, or you, the Court may revise these

21  conditions.  While under supervision, you must not consume

22  alcoholic beverages.  You must pay all or a part of the cost

23  for participation in the program not to exceed the sliding-fee

24  scale as established by the Department of Health and Human

25  Services and adopted by this Court.

1          I hope they're able to get your physical health under

2    control, Mr. Smith, as well as the other issues that have been

3    discussed today.

4          **THE DEFENDANT:**  You think the prison is going to help

5    me with that?

6          **THE COURT:**  What?

7          **THE DEFENDANT:**  And you think prison is going to help

8    me with that?

9          **THE COURT:**  I'm hoping.

10         **THE DEFENDANT:**  You hoped that last sentence and it

11   didn't help.

12         **THE COURT:**  That's the best I can do.  Good luck,

13   sir.

14         **THE DEFENDANT:**  You'll find out.

15         **MR. VANDERCOY:**  Could I ask the Court recommend in

16   the judgment that he receive appropriate medical treatment for

17   the diagnosis?

18         **THE COURT:**  Medical treatment for what?  I'm sorry.

19         **MR. VANDERCOY:**  For the potential colon cancer.

20         **THE COURT:**  Yeah, I'll add that.

21         The Court also recommends that the Bureau of Prisons

22   designate as the place of the defendant's confinement a

23   facility that can address the defendant's potential colon

24   cancer.

25         **MR. VANDERCOY:**  Thank you.

1          **THE COURT:**  Thank you.

2          Thank you, folks.

3          **LAW CLERK:**  All rise.

4          **(All comply; proceedings concluded.)**

5                          **\*\*\***

6                       **CERTIFICATE**

7      I, DEBRA J. BONK, certify that the foregoing is a

8  correct transcript of the record of proceedings in the

9  above-entitled matter.

10     DATED THIS DAY 17TH DAY OF AUGUST, 2023.

11                     **S/S DEBRA J. BONK**

12                 **DEBRA J. BONK**
                   **FEDERAL CERTIFIED REALTIME REPORTER**
13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CASE NUMBER: 3:10CR107-001** |
| **Plaintiff,** | **USM Number: 11189-027** |
| **vs.** | |
| **JASON SMITH** | **DAVID E VANDERCOY - FCD** |
| **Defendant.** | **DEFENDANT'S ATTORNEY** |

**JUDGMENT IN A CRIMINAL CASE**
(For Revocation of Supervised Release)

**THE DEFENDANT** was found in violation of conditions of his term of supervised release listed below.

**ACCORDINGLY,** the court has adjudicated that the defendant is guilty of the following offenses:

| Violation Number | Nature of Violation | Date Violation Concluded |
|---|---|---|
| Mandatory Condition No. 1, Violation No. 2 | On or around May 18, 2023, the defendant committed the offense of Count I: Resisting Law Enforcement, a Level 6 Felony, a violation of I.C. 44.1-3-1(a)(3) and I.C. 35-44.1-3-1(c)(1)(A), as evidenced by the information contained in the Probable Cause Affidavit and Charging Information filed in St. Joseph Superior Court under cause 71D03-2306-F6-000606. | May 18, 2023 |
| Mandatory Condition No. 1, Violation No. 3 | On or around May 18, 2023, the defendant committed the offense of Fleeing, 4th Degree, in violation of MCL 257.602a(2), as evidenced by the Berrien County Sheriff's Department case 323-010132. The defendant was subsequently charged the 5th Judicial District Court under case 2023015502. | May 18, 2023 |
| Mandatory Condition No. 2, Violation No. 2 | On July 25, 2022, the defendant submitted a urine specimen, which was analyzed and yielded a positive result for marijuana. The defendant admitted to using marijuana on or around July 20, 2022. | July 25, 2022 |
| Mandatory Condition No. 2, Violation No. 3 | On November 4, 2022, the defendant submitted a urine specimen, which was analyzed and yielded a positive result for marijuana. The defendant denied use, but a subsequent laboratory test confirmed the aforementioned test result. | November 4, 2022 |
| Mandatory Condition No. 2, | On December 5, 2022, the defendant submitted a urine specimen, which was analyzed and yielded | December 5, 2022 |

| Violation No. 4 | a positive result for marijuana. The defendant admitted to using marijuana on or around December 2, 2022. | |
| Mandatory Condition No. 2, Violation No. 5 | On February 23, 2023, the defendant was directed to report to the probation office to submit a random drug test and failed to report. | February 23, 2023 |

The defendant is sentenced as provided in pages 2 through 6 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**IT IS ORDERED** that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States Attorney of any material change in economic circumstances.

July 17, 2023
_____
Date of Imposition of Judgment

s/ Robert L. Miller, Jr.
_____
Signature of Judge

Robert L. Miller, Jr., United States District Judge
_____
Name and Title of Judge

July 17, 2023
_____
Date

Defendant: JASON SMITH
Case Number: 3:10CR107-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **21 months.**

The Court makes the following recommendations to the Bureau of Prisons:

      The Court recommends that the Bureau of Prisons designate as the place of the defendant's confinement a facility, consistent with the defendant's security classification as determined by the Bureau of Prisons, where the defendant may receive mental health treatment and medical treatment for his medical conditions.

The defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this judgment as follows:

      Defendant delivered _____ to _____ at _____, with a certified copy of this judgment.

                          _____
                          UNITED STATES MARSHAL

                    By: _____
                         DEPUTY UNITED STATES MARSHAL

A90

Defendant: JASON SMITH
Case Number: 3:10CR107-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **1 year** subject to the following conditions:

## CONDITIONS OF SUPERVISION

1.   You must not commit another federal, state, or local crime.

2.   You must not unlawfully possess a controlled substance.

3.   You must not unlawfully use any controlled substance, including marijuana, and must submit to one drug test within 15 days of the beginning of supervision and at least 2 periodic tests after that for use of a controlled substance.

4.   You must be lawfully employed full-time (at least 30 hours per week). If you are not employed full-time, you must try to find full-time employment under the supervision of the probation officer. If you become unemployed, or change your employer, position, or location of employment, you must tell the probation officer within 72 hours of the change. If after 90 days you do not find employment, you must complete at least 10 hours of community service per week until employed or participate in a job skills training program approved and directed by your probation officer.

5.   You must report in person to the probation office, in the district which you are released, within 72 hours of release from the custody of the Bureau of Prisons. You must report to the probation officer in the manner and as frequently as the court or the probation officer directs; and you must notify the probation officer within 48 hours of any change in residence, and within 72 hours of being arrested or questioned by a police officer.

6.   You must not travel knowingly outside the federal judicial district without the permission of the court. Alternatively, the probation officer will grant such permission when doing so will reasonably assure the probation officer's knowledge of your whereabouts and that travel will not hinder your rehabilitation or present a public safety risk.

7.   You must truthfully answer any inquiry by the probation officer and must follow the instruction of the probation officer pertaining to your supervision and conditions of supervision. This condition does not prevent you from invoking the Fifth Amendment privilege against self-incrimination.

8.   You must permit a probation officer to meet at your home or any other reasonable location and must permit confiscation of any contraband the probation officer observes in plain view. The probation officer will not conduct such a visit between the hours of 11:00 p.m. and 7:00 a.m. without specific reason to believe a visit during those hours would reveal information or contraband that wouldn't be revealed through a visit during regular hours.

9.   You must not meet, communicate, or otherwise interact with persons whom you know to be engaged or planning to be engaged in criminal activity.

4

10.     You must not possess a firearm, ammunition, destructive device, or any other dangerous weapon (meaning an instrument designed to be used as a weapon and capable of causing death or serious bodily harm).

11.     You must not enter into any agreement to act as an informant or special agent of a law enforcement agency without the court's permission.

12.     Unless an assessment at the time of release from imprisonment or commencement of probation indicates to the court that participation is unnecessary, you must participate in a substance abuse treatment program or aftercare program and a mental health treatment program or aftercare program. The court will receive notification of such assessment. You must abide by all treatment program requirements and restrictions, consistent with the conditions of the treatment provider. You will be required to participate in drug and/or alcohol testing, not to exceed 85 drug and/or alcohol tests per year. At the request of a treatment provider, probation officer, or you, the court may revise these conditions. While under supervision, you must not consume alcoholic beverages. You must pay all or a part of the costs for participation in the program, not to exceed the sliding fee scale as established by the Department of Health and Human Services and adopted by this court. Failure to pay these costs will not be grounds for revocation unless the failure is willful.

Defendant: JASON SMITH
Case Number: 3:10CR107-001

Name: <u>JASON SMITH</u>
Docket No.: <u>3:10CR107-001</u>

## ACKNOWLEDGMENT OF SUPERVISION CONDITIONS

Upon a finding of a violation of probation or supervised release, I understand that the Court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

I have reviewed the Judgment and Commitment Order in my case and the supervision conditions therein.  These conditions have been read to me.  I fully understand the conditions and have been provided a copy of them.

(Signed)

_____     _____
Defendant                                                                            Date


_____     _____
U.S. Probation Officer/Designated Witness                    Date

A93